# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## No. 23-5848

_____

### UNITED STATES OF AMERICA,

#### Plaintiff-Appellee

### v.

### CHRISTOPHER GOINS,

#### Defendant-Appellant

---

**Appeal from the United States District Court
For the Eastern District of Kentucky at Lexington
Criminal Action No. 5:22-cr-91-S
Hon. Gregory F. Van Tatenhove**

---

## BRIEF FOR APPELLANT

---

ROBERT L. ABELL
PO Box 983
Lexington, KY 40588
859-254-7076
859-281-6541 Fax
Robert@RobertAbellLaw.com
COUNSEL FOR APPELLANT

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5848

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CHRISTOPHER GOINS,

Defendant-Appellant

---

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTERESTS

---

Pursuant to the Sixth Circuit Rule, 25 Defendant-Appellant Trenton Layne Taylor makes the following disclosures:

1.      Are any of the said parties a subsidiary or affiliate of a publicly owned corporation? RESPONSE: No.

2.      If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party: RESPONSE:     See the Response above.

If the answer is YES, list the identity of such corporation and the nature of the financial interest: RESPONSE: See Response above.

/s/ Robert L. Abell
Robert L. Abell
Counsel for Appellant

ii

# Table of Contents

**Page #**

Table of Contents..............................................................................iii

Table of Authorities...........................................................................v

Statement Regarding Oral Argument.............................................viii

Statement of Jurisdiction.....................................................................1

Statement of Issue Presented for Review...........................................1

Statement of the Case..........................................................................1

Statement of Relevant Facts................................................................2

Goins's Motion to Dismiss..................................................................2

The District Court's Opinion and Order.............................................4

Goins's Conditional Plea & Sentencing.............................................9

Summary of Argument.......................................................................10

Argument............................................................................................11

    Point 1..........................................................................................11

    The Second Amendment Bars Goins's Prosecution for Violating
    18 U.S.C. § 922(g)(1)

    (A)    Introduction; the Impact of *Bruen*...............................11

    (B)    Goins is among "the people" covered by the plain text of the
        Second Amendment.......................................................14

    (C)    The common law developments in England and colonial
        disarmament measures relied upon by the district court are not
        "distinctly similar" historical precursors to § 922(g)(1) because

they did not ban and punish a rights-retaining citizen's possession of firearms in the home...........................................20

(1) "Distinctly similar" historical precursors to § 922(g)(1) are required.....................................................................20

(2) The English laws and practices cited by the district court are not "distinctly similar" historical precursors to § 922(g)(1).....................................................................24

(3) The disarming of slaves, Catholics, Native Americans, Catholics and free Blacks are not "distinctly similar" historical precursors to § 922(g)(1).................................30

(D) Felon in possession laws appeared in only the 20th century.....39

(E) No "distinctly similar" historical analogues support Goins's prosecution and the general standard articulated by the district court would grant Congress virtual *carte blanche* to ban and punish the exercise of a fundamental, enumerated right.........40

Conclusion.................................................................................44

Certificate of Service....................................................................45

Rule 32(a)(7)(B) Certificate of Compliance.................................45

Addendum......................................................................................A

# Table of Authorities

**Cases**                                                                    **Page #**

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...........................*passim*

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857)..........................30-31

*Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866)..........................................34

*Kanter v. Barr,* 919 F.3d 437 (7th Cir. 2019)...............................6, 8-9, 18-19,
                                                                                    28, 37, 39, 44

*Lange v. California*, 141 S.Ct. 2011 (2021)....................................................43

*McDonald v. City of Chicago*, 561 U.S. 242 (2010)......................................17

*New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).......*passim*

*Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023)(*en banc*)........*passim*

*Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016)
    (*en banc*)...............................................................................5, 14, 16, 39

*Ullman v. United States*, 350 U.S. 422 (1956).............................................35

*United States v. Bowers,* 594 F.3d 522, 527 (6th Cir.), *cert. denied,*
    562 U.S. 936 (2010)...............................................................................14

*United States v. Brown*, 381 U.S. 437 (1965)...............................................34

*United States v. Bullock*, ___ F.Supp.3d ___, 2023 WL 4232309
    (S.D. Miss., June 28, 2023)......................................................12-13, 16

*United States v. Burgess*, 2023 WL 179886 (6th Cir. 2023)........................12

*United States v. Carey*, 602 F.3d 738 (6th Cir. 2010).....................................4

*Folajtar v. Attorney General*, 980 F.3d 897, 912 (3rd Cir. 2020),

*cert. denied*, 141 S.Ct. 2511 (2021)........................................19, 36-37, 44

*United States v. Frazier*, 314 Fed.Appx. 801 (6th Cir. 2008)........................4

*United States v. Goins*, 647 F.Supp.3d 538 (E.D. Ky. 2022)...............*passim*

*United States v. Greeno*, 679 F.3d 510 (6th Cir.), *cert. denied*,
    568 U.S. 922 (2012)................................................................11

*United States v. Khami*, 362 Fed.Appx. 501 (6th Cir. 2010).......................4-5

*United States v. Price*, 635 F.Supp.3d 455 (S.D. W.Va. 2022)....................21

*United States v. Rahimi,* 61 F.4th 443 (5th Cir.), *cert. granted*,
    143 S.Ct. 2688 (2023)...........................................................11, 25, 29-30

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)..........................18

*United States v. Waddell*, 112 U.S. 76 (1884).............................................34

*Ex parte Wilson*, 114 U.S. 417 (1885)......................................................35

## Constitutional Provisions & Statutes

U.S. Const. amend. II................................................................*passim*

U.S. Const. art. I, §§ 9-10.......................................................................34

U.S. Const. art. III, §§ 2-3.......................................................................34

18 U.S.C. § 922(g)(1)...........................................................................*passim*

18 U.S.C. § 922(g)(4)...........................................................................5, 16-17

18 U.S.C. § 922(k)..................................................................................21

18 U.S.C. § 924(a)(1)(A)..........................................................................2

18 U.S.C. §3231.......................................................................................1

28 U.S.C. § 1291.....................................................................................1

1871 Tex. Gen. Laws § 1.........................................................................22

1 Laws of Ky., ch. 54, § 5, p. 106 (1799)....................................................31-32

1756 Va. Laws ch. 4, in Hening's Stat. at Large 36 (1802)..........................33

1 Stat. 272 (1792)................................................................................35

1715 Md. Acts. Ch. 40, ¶ 5, in 1 Kilty's Laws 1799........................................35

1757 Va. Laws ch. 3, ¶ 15, in 7 Hening's Stat. at Large 100..........................35

1784-1785 Mass. Acts & Resolves ch. 46, p. 516.....................................35-36

1703 Del. Acts ch. 36, § 4 in 2 Del Laws 1137 (1797)...................................36

1807 Pa. Acts. Ch. 2,854, § 15 in 18 Pa. Stat. at Large 595-96 (1915)...........36

1821 Conn. Pub. Stat. Laws 56......................................................................36

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law:* The *Interpretation of Legal Texts* (2012)...............................................................17

C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009).......................................................15, 17, 40

C.K. Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Harv. J.L & Pub. Pol'y 695 (2009)............................................37, 39

John Gilmary Shea, *The Catholic Church in Colonial Days* (1886)............32

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007)...........23, 36

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 Tex. Rev. L. & Pol. 245 (2021)......................................39

Letter (May 29, 1792), in 3 *Works of Thomas Jefferson* 365
(H.A. Washington, ed. 1884)..............................................................33

5 Tucker's Blackstone 54-59 ...........................................................32

1 Tucker's Blackstone app. 394-396.............................................32

1 William Hawkins, *A Treatise of the Pleas of the Crown* §§ 8-9
(1716).................................................................................................27

## Statement Regarding Oral Argument

The Second Amendment issue raised in this case warrants that oral argument be held. Accordingly, appellant respectfully requests that the Court hold oral argument.

## Statement of Jurisdiction

The United States District Court for the Eastern District of Kentucky had jurisdiction over this case, because appellant Christopher Goins was charged with crimes occurring in that district. 18 U.S.C. § 3231.

Goins pleaded guilty conditionally to violating 18 U.S.C. § 922(g)(1)(felon in possession of a firearm), and the district court sentenced him to a term of six months imprisonment by judgment entered September 21, 2023. Judgment, R. 68, #387. [1] He appealed timely. Notice of Appeal, R. 69, #394. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of Issue Presented for Review

Whether the Second Amendment bars Goins's prosecution for violating 18 U.S.C. § 922(g)(1).

## Statement of the Case

The indictment charged Goins with a single count of violating 18 U.S.C. § 922(g)(1). Indictment, R. 1, #1. After Goins moved to dismiss the indictment on Second Amendment grounds, after the motion was fully briefed and after the district court ordered the government to submit further "briefing on whether the history and tradition relevant to the Second Amendment supports categorically disarming violent and non-

---

[1] The citations are to the district court's docket number ("R") and the PageID number ("#").

violent felons," Order, R. 20, #83, 87, the government obtained a superseding indictment that added a charge violating 18 U.S.C. § 924(a)(1)(A). Superseding Indictment, R. 22, #109. The added charge was later dismissed, and Goins pleaded guilty conditionally to the 922(g)(1) charge. Conditional Plea Agreement, R. 58, #327.

**Statement of Relevant Facts**

The relevant facts are summarized in the conditional plea agreement. R. 58, #327. Goins obtained the firearm by way of a "strawman" purchase from a pawn shop, the pawn shop became suspicious and contacted ATF. An ATF agent contacted Goins, and Goins surrendered the firearm to the ATF agent as requested. Goins's possession lasted six days from December 5 to December 11, 2021. Paragraph 3 of the conditional plea agreement elaborates in greater detail. #329-30.

In sum and to be clear, Goins was not found in possession of a firearm while committing some other crime. He was not encountered in public possessing the firearm. He was not found possessing the firearm while intoxicated or impaired by drugs. Law enforcement only encountered Goins possessing the firearm when he surrendered it to the ATF agent on the date, time and place directed.

**Goins's Motion to Dismiss**

Goins moved to dismiss the charge of violating 18 U.S.C. § 922(g)(1)
based on the Second Amendment and the Supreme Court's decision in *New
York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022). Motion to
Dismiss, R. 15, #38; Motion to Dismiss Superseding Indictment, R. 28,
#128.

Goins's prior felony convictions were in Kentucky state court,
specifically in Fayette Circuit Court case no. 19-CR-500 for DUI, 4th offense
(a Class D felony subject to 1 – 5 years imprisonment) and possession of a
controlled substance, first degree to second-degree burglary (a Class D or C
felony subject to either 1 -5 or 5 – 10 years imprisonment depending on the
quantity and nature of the drug involved).[2] The court required Goins to
serve only 120 days and imposed four years probation. R. 21-1 at 7 – 10.
These convictions made Goins subject to prosecution for violating 18 U.S.C.
§ 922(g)(1).

Goins's motion contended mainly that his prior felony convictions
were non-violent and that our Nation's historical tradition of firearm
regulation did not permit permanent disarming of felons, since felon-in-
possession laws did not exist until the 20th century and over 100 years after

---

[2] A true copy of the Fayette Circuit Court's indictment, judgment of
conviction and final judgment is in the record at R. 21-1, #99.

the Second Amendment and the Bill of Rights were adopted in 1791. R. 15, Motion to Dismiss, #38; R. 15-1, Memorandum Supporting Motion to Dismiss at 7-9; #40, 46-48. Goins argued also that the Nation's historical tradition of disarming non-violent felons was even weaker than with regard to felons generally. R. 19, Reply Memorandum Supporting Motion to Dismiss at 5-10, #67, 71-76; R. 26, Supplemental Reply Memorandum Supporting Motion to Dismiss, #118.

**The District Court's Opinion and Order**

The district court denied Goins's motion to dismiss. Opinion & Order, R. 32, #173; 647 F.Supp.3d 538 (E.D. Ky. 2022). The principal theory driving the court's ruling was that "the British common law that informed our founding era enactments included the power to disarm individuals who posed a danger to public safety." 647 F.Supp.3d at 540. The court below's analysis will be considered in three parts.

First, the district court rejected the government's contention that this Court's precedents required that Goins's motion be denied. The district court considered three cases, *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010); *United States v. Frazier*, 314 Fed.Appx. 801 (6th Cir. 2008); and, *United States v. Khami*, 362 Fed.Appx. 501 (6th Cir. 2010); and concluded they were not controlling, because *Carey* and *Frazier* relied on dicta, and

*Khami* involved a facial challenge to § 922(g)(1), rather than an as-applied challenge like Goins. *Id.* at 542-44. The district court further observed that *Bruen* had abrogated a substantial body of case law from this and other circuits applying scrutiny to Second Amendment burdens. *Id.* at 544-45. The district court also noted this Court's *en banc* decision in *Tyler v. Hillsdale Cnty. Sheriff's Office*, 837 F.3d 678 (6th Cir. 2016), where it allowed an as-applied challenge to § 922(g)(4), which prohibits possession of a firearm by someone with a history of mental illness, to go forward and observed that the Supreme Court had not invited "courts onto an analytical off-ramp to avoid constitutional analysis." 647 F.Supp.3d at 543, *quoting Tyler*, 837 F.3d at 686.

Second, the district court concluded that Goins, notwithstanding his prior convictions, remained among "the people" covered and protected by the Second Amendment. The court rejected the government's contention that *Bruen*'s references to the plaintiffs therein as "law-abiding" citizens meant that Goins's convictions forfeited for him the Second Amendment's protections. *Id.* at 544-45.

The district court next considered and rejected the government's contention that the Second Amendment covered only "virtuous citizens," a status that Goins, the government contended, forfeited by his felony

convictions. The court explained that "the virtuous citizen theory is inconsistent with history and *Heller*,[3] [and] the government cannot rely on it to justify universally stripping felons of their Second Amendment rights." *Id.* at 546.

The district court concluded that the best approach to considering the scope of the Second Amendment was to analyze when "the government may take [ ] away" its protections. *Id.* at 547. This adopted the approach of then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 452-53 (7th Cir. 2019). The district court further observed that "[t]aking the right to bear arms away from people *ab initio*" would cause the judiciary to solely determine the scope of the Second Amendment and preclude "Congress's consideration of the benefits to society of disarming certain groups [and] determining which groups are disarmed." 647 F.Supp.3d at 547, *citing Kanter*, 919 F.3d at 452 (Barrett, J., dissenting).

Finally, the district court concluded that construing "the people" protected by the Second Amendment to exclude Goins was inconsistent with the Supreme Court's analysis in both *Heller* and *Bruen*. "*Heller* determined that the Second Amendment's use of 'the people' is consistent with the other six provisions of the Constitution that reference 'the people.'"

---

[3] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

*Id.*, *quoting Heller*, 554 U.S. at 580. *Bruen*, for its part, focused its "analysis on the scope of the Second Amendment on the legislative actions that it permits and prohibits." 647 F.Supp.3d at 548.

The district court erred in concluding that it need only identify a historical analogue "relevantly similar" to § 922(g)(1)'s application to Goins. 647 F.Supp.3d at 548. *Bruen* distinguishes between firearm regulations aimed at long-standing social problems and those that were neither encountered nor foreseeable to the Founders. 142 S.Ct. at 2131-33; *Bruen* demands a "distinctly similar" analogue for the former but only a "relevantly similar" analogue as to the latter. *Id.* Since the district court did correctly identify the age-old social problem of crime control as the point of § 922(g)(1)'s application to Goins, 647 F.Supp.3d at 554-55, it should have required a "distinctly similar" historical analogue that merely a relevantly similar one. This is the major flaw in the district court's analysis.

"History supports Congress's decision to strip Mr. Goins of his right to bear arms," the district court asserted. *Id* at 548. There are no founding-era laws that disarm felons, and the district court described failed proposals at to state ratifying conventions "of limited help" to the government, *Id.* at 548-49, and further pronounced the historical record in the founding-era as mixed. *Id.* at 548-50. Nevertheless, "'[t]hose who ratified the Second

Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of the law.'" *Id.* at 550-51, *quoting*, Justice Barrett's dissent in *Kanter v. Barr*, 919 F.3d at 461.

After finding unclear the historical record regarding disarming those who had committed "serious crimes and felonies," the district court turned then "to English history and custom prior to the founding because" the Second Amendment codified a right inherited from our English ancestors and "deeply rooted [English] 'precedents stretching from Bracton to Blackstone'" is relevant. *Id.* at 551, *quoting Bruen*, 142 S.Ct. at 2136.

The district court saw the "English common law tradition of disarming citizens" as dating back to the 14th century and the Statute of Northampton, which, the court acknowledged, had largely "fallen into disuse" by the latter half of the 17th century. *Id.* at 550-51. Stronger historical evidence, the district court asserted, was found between 1660, the time of the Stuart dynasty restoration, and the Glorious Revolution of 1688. *Id.* at 552, *citing Bruen* at 2140. The court cited the Militia Act of 1662, which allowed the King's men to "disarm anyone they judge to be 'dangerous to the Peace of the Kingdom,'" as illustrative of a relevant historical tradition. 647 F.Supp.3d at 552.

The district court found further support for § 922(g)(1) in English and colonial legislation that disarmed certain groups including Catholics, perceived loyalists in the colonies, and slaves and Native Americans. *Id.* at 552-54. In sum and "[s]imply put," the district court concluded, "the history and tradition relevant to the Second Amendment support Congress's power to disarm those that it deems dangerous." *Id.* at 554, again *citing* Justice Barrett's dissent *Kanter v. Barr*, 919 F.3d at 464.

The district court identified general crime control as the basis justifying Congress's disarming of Goins. 647 F.Supp.3d at 554-55. Goins' felony convictions mark him as more likely to reoffend and put public safety at issue, the district court asserted and recited statistical studies regarding recidivism. *Id.*

**Goins's Conditional Plea & Sentencing**

Goins and the government entered a conditional plea agreement: he pleaded guilty to one count of violating 18 U.S.C. § 922(g)(1) and retained "the right to appeal the district court's denial of his pretrial motion to dismiss[.]" Conditional Plea Agreement, R. 58, #327.

The district court imposed only a six-month term of imprisonment. R. 68, Judgment, #387. The imprisonment range indicated by the sentencing guidelines was 30-37 months. R. 75, Transcript at 24, #472, 495. The

district court observed that Goins presented, as evidence of redemption and rehabilitation, "one of the most powerful [stories] that I've seen[.]" *Id.* at 23, #494.

The district court observed further that Goins's cooperation and prompt surrender of the firearm to the ATF agent presented "unique mitigating facts," *Id.* at 26, #497, and that Goins offered "in many ways … an influence now in [his] community that's going to help people change their lives in a way that makes us safer." *Id.* at 26-27, #497-98. In sum, the district court concluded that "a significant variance is appropriate, both in terms of the nature and circumstances of the conduct here, but also in terms of [Goins's] history and characteristics, the change [Goins had] made in [his] life, the commitment [Goins had] made to live better and be good again." *Id.* at 30, #501.

## Summary of Argument

Goins's prosecution for violating 18 U.S.C. § 922(g)(1) is barred by the Second Amendment. First, Goins remains among "the people" covered by the Second Amendment, notwithstanding his prior felony convictions. As such, under *Bruen* his prosecution is presumptively unconstitutional. *Bruen* imposes a "straightforward" requirement for "distinctly similar" historical analogues to § 922(g)(1)'s application to Goins.  The disparate

collection of English and colonial laws and practices relied upon by the district court do not meet this requirement. The district court's assertion that these authorities empower Congress to disarm and punish those deemed by it to pose "a danger to public safety" is contrary to *Bruen*'s requirement that exceptions to the Second Amendment's "unqualified command" be "well defined." Furthermore, this type of generalized standard sanctions a government-magnifying, rights-minimizing rule granting Congress *carte blanche* to disarm and punish the exercise of a fundamental, enumerated right.

## Argument

### Point 1

### The Second Amendment Bars Goins's Prosecution for Violating 18 U.S.C. § 922(g)(1)

#### (A)    Introduction; the Impact of *Bruen*

The Supreme Court's decision in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) "clearly fundamentally changed [the] analysis of laws that implicate the Second Amendment[.]" *United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023). The Court repudiated in *Bruen* the two-step analysis adopted by this Court, *United States v. Greeno*, 679 F.3d 510 (6th Cir.), *cert. denied*, 568 U.S. 922 (2012), and other circuits to evaluate Second Amendment challenges to firearm

laws, labeling that "one step too many." *Bruen*, 142 S.Ct. at 2127; *United States v. Burgess*, 2023 WL 179886 *5 (6th Cir. 2023)(noting that *Bruen* had abrogated *Greeno*). Seeking to elevate the Second Amendment from second-class status, the Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," in which case, the government must demonstrate that the law and its application, "is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2130. *Bruen*, in short, instituted a historical test regarding the constitutionality of Goins's prosecution for violating 18 U.S.C. § 922(g)(1).

*Bruen* has generated substantial litigation regarding the constitutionality of 18 U.S.C. § 922. The vast majority of courts have held that *Bruen* does not affect the constitutional application of § 922(g)(1), as applied to persons with a prior or prior felony convictions. The two exceptions so far are the *en banc* Third Circuit in *Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023), which held that the plaintiff's nearly 30-year-old conviction for filing a fraudulent claim for unemployment compensation could not support his permanent disarming. The other is the district court in *United States v. Bullock*, ___ F.Supp.3d ___, 2023 WL 4232309 (S.D. Miss., June 28, 2023), where the court dismissed a §

922(g)(1) prosecution against a defendant whose previous conviction was for manslaughter.

The cases involving the constitutionality of § 922(g)(1) have turned, by and large, on two issues. The first is whether a felon remains among "the people" covered by the Second Amendment. A number of courts have held a convicted felon is not among "the people" covered by the Second Amendment, as the government argued below. These decisions derive from the dicta in the Supreme Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570, 626-27, n. 27, 635 (2008), to "law-abiding citizens" and "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . ."). *Bullock, supra*, 2023 WL at *17.  Some courts have augmented their analysis by tallying "the felon-in-possession votes implied by *Bruen*'s concurrences and dissent" wherein six Justices, five of whom remain on the Court, endorsed felon disarmament. *Bullock* at *19. These rulings short-circuit the historical analysis indicated by *Bruen*, because if a convicted felon is not among "the people" covered by the Second Amendment, the amendment's plain text does not apply to his conduct.

13

The second issue is whether our Nation's historical tradition of firearm regulation includes disarming one of "the people" on account of a felony conviction. *Bruen* established two tracks for considering this question depending on whether the point of regulation was an old one, like as here, potential further crimes by a convicted felon, or new one or a new technology.

This Court reviews *de novo* the issue of whether the Second Amendment bars Goins's prosecution for violating 18 U.S.C. § 922(g)(1). *United States v. Bowers,* 594 F.3d 522, 527 (6th Cir.), *cert. denied*, 562 U.S. 936 (2010).

**(B)   Goins is among "the people" covered by the plain text of the Second Amendment**

The threshold issue is whether Goins, notwithstanding his felony convictions, remains among "the people" covered by the Second Amendment. The district court held that he is, and this Court should agree. First, a contrary ruling would ignore the Second Amendment's plain text. Second, *Bruen*'s holding requires that the Court examine Goins's conduct not his status. Third, this Court's *en banc* holding in *Tyler v. Hillsdale County Sheriff's Office*, 837 F.3d 678 (6th Cir. 2016), goes far in resolving that Goins remains among "the people" covered by the Second Amendment. Finally, the phrase "the people" appears in numerous places in the

Constitution, and the Supreme Court has not indicated that "the people" referred to by the Second Amendment are different than "the people" covered by the First and/or Fourth Amendments or referred to elsewhere in the Constitution.

The Second Amendment provides as follows:

> A well regulated Militia, being necessary to the security of a free State, *the right of the people* to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The Second Amendment recognizes an individual right. "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595.

The text of the Second Amendment does not except those with any prior felony convictions or other civil disabilities. This absence is "echoed in state constitutional provisions" as "[o]nly one state constitutional provision addressing the right to bear arms contains an exception for felons[,]" this being Idaho's enacted in 1978. C. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375 (2009)(Larson, *Four Exceptions*). "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 581.

*Bruen* does not retreat from this point. *Bruen* held "that when the Second Amendment's plain-text covers and individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. This requires courts "to look at the 'conduct' being regulated, not the status of the person performing the conduct." *Bullock, supra* at *20.

This Court's analysis and decision in *Tyler, supra,* supports the conclusion that Goins remains among "the people" covered by the Second Amendment and may raise this "as applied" challenge. *Tyler* involved an "as applied" challenge to 18 U.S.C. § 922(g)(4), which criminalizes firearm possession by an individual that "has been committed to a mental institution", as the plaintiff had some 30 years prior. The district court had dismissed the plaintiff's declaratory judgment action "relying on *Heller*'s observation that prohibitions on the possession of firearms by the mentally ill were presumptively lawful and concluding that [the plaintiff] was not within the ambit of the Second Amendment as historically understood." 837 F.3d at 684.

The Court rejected this reasoning, held that the plaintiff could properly mount his "as applied" challenge to § 922(g)(4), and explained as follows:

> While we "are obligated to follow Supreme Court dicta," *Heller* only established a presumption that such bans

16

were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis. A presumption implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge."

837 F.3d at 686 (citations omitted).

The Court also noted "§ 922(g)(4)'s lack of historical pedigree," observed that it "was not enacted until 1968" and *Heller*'s "command" that "historical evidence [determined] the scope of the Second Amendment." *Id.* at 687. Section 922(g)(1)'s historical pedigree dates only to 1938. *Id.* at 708 (Sutton, J., concurring). More generally, felon-in-possession laws did not exist until the 20th century. "[S]tate laws prohibiting felons from possessing firearms or denying firearms license to felons date from the early part of the twentieth century." Larson, *Four Exceptions*, 60 Hastings L.J. at 1376.

The *en banc* Third Circuit in *Range v. Attorney General,* 69 F.4th 96 (3rd Cir. 2023), held that the dicta in *Bruen*, *Heller* and/or the Supreme Court's other relatively recent Second Amendment case, *McDonald v. City of Chicago,* 561 U.S. 242 (2010), did not remove a felon from "the people" covered by the Second Amendment. The Third Circuit first relied upon the presumption of consistent usage which posits that "[a] word or phrase is presumed to bear the same meaning throughout a text." Antonin Scalia & Bryan A. Garner, *Reading Law:* The *Interpretation of Legal Texts* 170 (2012). In *Heller*, the Court quoted a prior case that emphasized the

17

common meaning of "the people" referenced in the First, Second, Fourth,

Ninth and Tenth Amendments:

> " '[T]he people' seems to have been a term of art employed in
> select parts of the Constitution .... [Its uses] sugges[t] that 'the
> people' protected by the Fourth Amendment, and by the First
> and Second Amendments, and to whom rights and powers are
> reserved in the Ninth and Tenth Amendments, refers to a class
> of persons who are part of a national community or who have
> otherwise developed sufficient connection with this country to
> be considered part of that community."

554 U.S. at 580, *quoting United States v. Verdugo-Urquidez*, 494
U.S. 259, 265 (1990).

The Third Circuit noted that the Constitution referred to "the people"

twice with respect to voting for Congress, and that "the people" also enjoy

rights to assemble peaceably, to petition the government for redress and to

be protected against unreasonable searches and seizures. 69 F.4th at 101.

The Third Circuit found "no reason to adopt an inconsistent reading of 'the

people'" and noted *Heller*'s remarks quoted-above pointed toward a

consistent reading of "the people." *Id.* at 102.

Second, the Third Circuit noted and agreed with "then-Judge

Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively

explained that 'all people have the right to keep and bear arms,' though the

legislature may constitutionally 'strip certain groups of that right.'" 919

F.3d 437, 452 (7th Cir. 2019). The district court here cited this same

analysis. 647 F.Supp.3d at 547.

Third, the Third Circuit analyzed "the phrase 'law-abiding,

responsible citizens'" and condemned it "as expansive at it is vague." 69

F.4th at 102. As regards law-abiding citizens, the Third Circuit was

confident that "the Supreme Court's references to 'law-abiding, responsible

citizens' do not mean that every American who gets a traffic ticket" is

removed from "the people" covered by the Second Amendment. *Id.* Quite

right that surely is.

Finally, the Third Circuit observed that holding that "only 'law-

abiding, responsible citizens' are protected by the Second Amendment

devolves authority to legislators to decide whom to exclude from 'the

people.'" *Id.* at 102.  That result was untenable for two reasons: (1) it would

grant "'legislatures unreviewable power to manipulate the Second

Amendment by choosing a label.'" 69 F.4th at 102-03, *quoting Folajtar v.*

*Attorney General*, 980 F.3d 897, 912 (3rd Cir. 2020), *cert. denied*, 141 S.Ct.

2511 (2021)(Bibas, J., dissenting); and, (2) it "would contravene *Heller*'s

reasoning that 'the enshrinement of constitutional rights necessarily takes

certain policy choices off the table.'" 69 F.4th at 103, *quoting Heller*, 554

U.S. at 636.

The Court should conclude that Goins remains among "the people" covered by the Second Amendment notwithstanding his prior felony convictions.

**(C)   The common law developments in England and colonial disarmament measures relied upon by the district court are not "distinctly similar" historical precursors to § 922(g)(1) because they did not ban and punish a rights-retaining citizen's possession of firearms in the home**

### (1)   "Distinctly similar" historical precursors to § 922(g)(1) are required

Since Goins is among "the people" covered by the Second Amendment, the government must demonstrate to rebut the presumption of unconstitutionality that § 922(g)(1) as applied to him "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. The nature of that burden varies depending on what kind of problem a statute is designed to address; more specifically, whether the problem is old or new.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry is "fairly straightforward." *Id.* at 2131. The government must identify a robust tradition of "distinctly similar" Founding-era regulations. *Id.* If "the Founders themselves could have adopted" a particular regulation "to confront [a long-standing]

problem," but did not do so, that is evidence the statute is unconstitutional today. *Id.* This is also true if some jurisdictions in the Founding era attempted to enact analogous regulations but those proposals were rejected on constitutional grounds. *Id.* Both the *Heller* and *Bruen* cases were in this category: the laws at issue in those cases aimed at a problem – "handgun violence, primarily in urban areas" – that existed at the Founding, and the Court accordingly required a tight fit between those laws and historical precursors. *Id.*; *see also United States v. Price*, 635 F.Supp.3d 455, 463 (S.D. W.Va. 2022) (explaining 18 U.S.C. § 922(k)'s restriction on firearms with obliterated serial numbers addresses long-standing societal problem of "crime").

A looser and "more nuanced approached" applies to regulations "implicating unprecedented societal concerns or dramatic technological changes" are addressing a problem that was "unimaginable at the founding." *Bruen*, 142 S.Ct. at 2132. The "central considerations" in the "relevantly similar" analysis are two: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the "how"]; and, (2) whether that burden is comparably justified [i.e., the "why"]." *Id.* at 2132-33.

These different approaches require courts faced with a *Bruen* challenge to identify as a threshold matter the problem at which a statute is aimed, and then determine whether that problem existed in 1791, when the Second Amendment was adopted, or, instead, grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132. 18 U.S.C. § 922(g)(1) is aimed at felons' access to firearms, or, more generally stated, crime, both of which have posed a (potential) problem since long before 1791, when the Second Amendment was adopted.  The district court noted that Goins's convictions marked him for potential recidivism and, therefore, justified his permanent disarming. 647 F.Supp.3d at 554-55. Accordingly, the question presented here is whether § 922(g)(1), as applied to Goins, is "distinctly similar" to some substantial body of laws extant in and around the Founding era.

*Bruen* did not define "distinctly similar," but its analysis indicated a stringent standard. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person ... any pistol ... unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153, *citing* 1871 Tex. Gen. Laws § 1. The Court acknowledged that the Texas statute was sufficiently analogous to provide

historical support for New York's law. *Id.* at 2153. But the Court found only one other state had adopted a similar law before 1900 and concluded these few examples could not establish a historical tradition robust enough to allow New York's law to pass Second Amendment scrutiny. *Id.* The takeaway from this analysis is that, in a challenge to § 922(g)(1), a "distinctly similar" regulation would be one that either substantially abridged felons' right to keep and bear arms, or permanently denied firearms to some group very similar to felons (e.g., those convicted of some subset of especially serious crimes).

Bruen identified three "well-defined restrictions" on "the right to keep and bear arms in public" that have persisted throughout "modern Anglo-American history": laws "governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138. The Court found no tradition of "broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. It also found no tradition of broadly prohibiting the possession in one's home of firearms for self-defense. Nor could the Court have done so. "In essence, American law has recognized a zone of immunity surrounding the privately owned guns of citizens." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early*

*America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007) (reviewing the first fourteen states' codes from 1607 – 1815).

### (2)   The English laws and practices cited by the district court are not "distinctly similar" historical precursors to § 922(g)(1)

The district court cited English laws and practices, the Statute of Northampton from the 14th century, the Militia Act of 1662, the English Bill of Rights and English common law, as establishing a historical tradition of disarming persons deemed dangerous. This misreads history, misreads some of these authorities and, ultimately, misapplies the Supreme Court's requirement for a "distinctly similar" historical analogue.

The Statute of Northampton was, the Supreme Court conceded, arguably the "most prominent" of English "public carry" laws that it considered in *Bruen*. That it was a "public carry" law removes the Statute of Northampton, which was adopted in 1328, as a candidate to be a "distinctly similar" historical precursor to § 922(g)(1) as applied to Goins. Goins is not claiming that he should be permitted to carry about a firearm in public, whether concealed or not, and he is not claiming that he should be permitted to display or brandish a firearm in public. Goins wasn't prosecuted because he was found in possession of a firearm while out in

public. His claim is much more modest: the Second Amendment forbids that he be banned and punished from possessing a firearm in his home for self-defense. In any event and even if the Statute of Northampton were not a public carry law, the Supreme Court pronounced it of "little bearing on the Second Amendment adopted in 1791." *Bruen*, 142 S.Ct. at 2139. The court below erred in concluding that the Statute of Northampton served as a useful historical analogue to § 922(g)(1).

Contrary to the district court's assertion, "the Militia Act's provenance demonstrates that it is not a forerunner of our Nation's historical tradition of firearm regulation." *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir.), *cert. granted*, 143 S.Ct. 2688 (2023). The Militia Act authorized the King's men to disarm those they "'judge[d] dangerous to the Peace of the Kingdom.'" *Id.*, *quoting* 13 & 14 Car. 2, c. 3, § 13 (1662). But after the Glorious Revolution of 1688, which brought William and Mary to the English throne, the English Bill of Rights was adopted in 1689, and it provided that "'Protestants may have arms for their defense suitable to their Conditions and as allowed by Law.'" *Id.*, *quoting* 1 W & M, ch. 2, § 7, in 3 Engl. Stat. at Large 441. This provision "*restricted* the Militia Act's reach to prevent the kind of" arbitrary and abusive practices by the King's men authorized by the Militia Act. *Id.* (emphasis in original). Furthermore,

this provision of the English Bill of Right "'has long been understood to be the predecessor to our Second Amendment.'" *Id.*, *quoting Heller*, 554 U.S. at 593. "This understanding, and the history behind it, defeats any utility of the Militia Act of 1662 as a historical analogue for § 922(g)[(1)]." *Id.*

The English Bill of Rights, while a forerunner to the Second Amendment, nevertheless, fails to provide a "distinctly similar" historical analogue to § 922(g)(1). By any measure, the Second Amendment codified a right "to keep and bear arms" much broader and categorical than the English did. *See Heller*, 554 U.S. at 593 (The English right was "not available to the whole population," "was held only against the Crown, not Parliament," and extended only to the extent "allowed by law" and "suitable to" the subjects' "conditions."). The American people, on the other hand and following their Declaration of Independence from the English King and having fought a war to effect that independence, codified an unqualified right extending to all members of the political community, one that binds the legislature and the courts, and contains no written exceptions. Americans chose not to tolerate a law granting "local officials" broad authority to declare someone "dangerous to the Peace of the Kingdom" and disarm them. The Second Amendment itself represents a balancing of various interests by "the people," who came down emphatically and

unequivocally for an individual's right to keep and bear arms in his home for self-defense, and it is that "balance – struck by the traditions of the American people – that demands [the Court's] unqualified deference." *Bruen*, 142 S.Ct. at 2131.

English common law also distinguished between the right to go about armed in public and the right to possess a firearm for defense of one's home. Under English common law, only "Persons of Quality" could move about in public with armed "Attendants." 1 William Hawkins, *A Treatise of the Pleas of the Crown* 136 § 9 (1716). But anyone including a mere commoner could gather his friends to defend himself at his home, "because a Man's House is his Castle." *Id*. § 8.

While the 14th century Statute of Northampton, the Militia Act of 1662 and the English Bill of Rights do evidence an English tradition of infringing the right to keep and bear arms, that is true only in a generalized sense, one not congruent with *Bruen*'s demand for a "distinctly similar" historical tradition. The Statute of Northampton did empower disarming of those judged to cause public disturbance, forbade bearing arms in the presence of some of the King's ministers and apparatchiks and also forbade, as in *Sir John Knight's Case*, the threatening public display of weaponry, 647 F.Supp.3d at 551, it did not speak to the citizen's keeping and bearing of

arms in his home. The commoner's home, however humble, remained his castle. In any event, the Supreme Court pronounced this nearly 700-year-old law of "little bearing on the Second Amendment adopted in 1791." *Bruen*, 142 S.Ct. at 2139.

The English Bill of Rights also cannot serve as a "distinctly similar" historical analogue to § 922(g)(1). The limitations and conditions that the English saw fit to apply are similar to those considered by the constitutional ratifying conventions in New Hampshire, Massachusetts, and Pennsylvania. These were well-discussed by Justice Barrett in her dissenting opinion in *Kanter v. Barr*, 919 F.3d at 454-458. New Hampshire "recommended that a bill of rights include the following protection: 'Congress shall never disarm any citizen, unless such are or have been in actual rebellion.'" *Id.* at 454. Samuel Adams proposed to the Massachusetts Convention the following: "'And that the said Constitution be never construed to authorize Congress to ... prevent the people of the United States, who are peaceable citizens, from keeping their own arms.'" *Id.*  A minority proposal in Pennsylvania suggested the following: "'That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for

crimes committed, or real danger of public injury from individuals ...'" *Id.* at 455. "[N]one of the relevant limiting language made its way into the Second Amendment[.]" and "only New Hampshire's proposal – the least restrictive of the three – even carried a majority of its convention." *Id.* The other states "that advocated a constitutional right to bear arms did not contain similar language of limitation or exclusion." *Id.* None of the "four parallel state constitutional provisions enacted before ratification" included any similar limitations or exclusions. *Id.*

The English laws and common-law yield at best a mixed historical record. The Statute of Northampton is of little use to construing the Second Amendment, according to the Supreme Court, *Bruen*, 142 S.Ct. at 2139, the Militia Act of 1662 was rendered largely if not wholly a nullity by the English Bill of Rights, according to the Fifth Circuit. *Rahimi*, 61 F.4th at 456. The English Bill of Rights does contain conditions and limitations and may or may not contradict the principal recognized by English common law that "a man's home is his castle." But it does not appear necessary to resolve this conundrum: what is clear is that our new Nation went a different direction.

The historical record does indicate that some of the Founders considered inclusion in the Second Amendment of limitations and

conditions similar to those found in the English Bill of Rights. The minority proposal at the Pennsylvania ratifying convention is nearly indistinguishable from the English Bill of Rights. But neither it nor those considered by the New Hampshire or Massachusetts conventions made it into the text of the Second Amendment, and neither did any other condition or limitation. History and actual constitutional text indicates that, with respect to the right to keep and bear arms, our new Nation decided not to continue the limitations and conditions applied by the English from whom we fought a revolution to separate from.

### (3)   The disarming of slaves, Catholics, Native Americans, Catholics and free Blacks are not "distinctly similar" historical precursors to § 922(g)(1)

The district court also referred to practices and laws disarming those deemed Crown loyalists, slaves, native Americans, Catholics or even free Blacks. 647 F.Supp.3d at 554. These are poor examples of "distinctly similar" historical analogues to § 922(g)(1) as applied to Goins.

These laws did not infringe the right of any of "the people" to bear arms. As the Fifth Circuit has recognized, these bigoted laws were "targeted at groups excluded from the political community – i.e., written out of 'the people' altogether." *Rahimi*, 61 F.4th at 457. In *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), the Supreme Court described how far and fully

removed from "the people" were considered even a free black person: if free blacks were "citizens," that would mean necessarily that they could travel freely, speak freely, gather freely, "hold public meetings upon political affairs" and "keep and carry arms wherever they went." *Id.* at 417. To assert that the disarming of free blacks and slaves evidences a historical tradition supporting § 922(g)(1) is to misread both history and law badly.

Furthermore, it is incongruous to suppose that all the other individual rights enshrined by our Constitution were denied certain groups on account of detestable bigotry and repression, but the right to keep and bear arms was denied based on a rational policy determination that the public order was threatened. An example is a Kentucky law that banned every "negro, mulatto, [and] Indian whatsoever" from keeping any gun, club, or other "offensive or defensive" weapons. 1 Laws of Ky., ch. 54, § 5, p. 106 (1799). The person who reported the crime got to keep the weapons as bounty; the victim could be sentenced to whipping. *Id.*

If it had stopped at that, as detestable as it plainly is, one might generously theorize that such a law was aimed at or even needed to prevent violent attacks. But the same law forbade free blacks and multiracial people from exercising other rights of citizenship: giving testimony in any case involving at least one white party; meeting, in groups of "five or more" at

someone else's plantation or quarters; and "lifting his or her hand in opposition to" any white person, on pain of "thirty lashes." 1 Laws of Ky., ch. 54, §§ 2, 8, 13, pp. 106-08. And yet, even in a world that codified unforgivable brutality, torture and exploitation, Kentucky's "no firearms" law authorized exceptions for "housekeeper[s]" and others who lived on "frontier plantations." *Id.*, § 6, p. 106. The right to keep and bear arms in the home for self-defense existed, at least to some extent, even for those on the society's bottom rung.

The district court also referred to colonial and post-independence practices that disarmed Catholics upon pain of a loyalty oath sworn in the former era to the English crown and in the latter to "the sovereign and independent states." 647 F.Supp.3d at 552. It is true that before ratification of the Constitution, Catholic worship was a crime and gave rise to pervasive disabilities on both sides of the Atlantic. 5 Tucker's Blackstone 54-59; 1 Tucker's Blackstone app. 394-396; John Gilmary Shea, *The Catholic Church in Colonial Days* 409-12 (1886) (describing Virginia laws criminalizing Catholic worship and disqualifying them from voting, holding office, testifying as a witness). But even still Virginia recognized the need and right to keep and bear arms in the home, since another law required every "Papist, or reputed Papist" to sign an oath denying the truth of

32

transubstantiation, and anyone who refused was required to surrender his arms "other than such necessary weapons as shall be allowed to him ... for the defence of his house of person." 1756 Va. Laws ch. 4, in Hening's Stat. at Large 36 (1802) (emphasis added).

Laws and practices from the revolution-era that targeted loyalists are also unreliable analogues. Loyalists were not and were not considered part of "the people"; they were regarded as traitors or as enemy aliens and as potential combatants. Furthermore, the property and arms of the Loyalists were seized as a war expediency by our new nation. Thomas Jefferson, after the war and as Secretary of State, defended confiscation of Loyalist property as a permissible and legal war measure: "It cannot be denied that the state of war strictly permits a nation to seize the property of its enemies found within its own limits, or taken in war." Letter (May 29, 1792), in 3 *Works of Thomas Jefferson* 365, 369 (H.A. Washington, ed. 1884). Jefferson elaborated further on the measure as a war expediency, explaining that since our new nation was "excluded from all commerce, even with neutral nations, without arms, money, or the means of getting them abroad, we were obliged to avail ourselves of such resources as we found at home." *Ibid*.; *see Bruen*, 142 S.Ct. at 2133. The treatment of

Loyalists' property and arms was more about supplying and arming the American army, not preserving public safety.

The Constitution and the Bill of Rights repudiate the colonists' *ad hoc* pre-constitutional practices of denying rights of people deem disaffected, disloyal and/or dangerous. Put simply, the Constitution and Bill of Rights restricted the new government's power to categorically disqualify its citizens from exercising their rights. The Bill of Attainder Clauses ended the "doctrine of disqualification, disenfranchisement, and banishment by acts of the legislature." *United States v. Brown*, 381 U.S. 437, 444 (1965)(internal quotation omitted); *see* U.S. Const. art. I, §§ 9-10. Article III, § 2 guaranteed a jury trial for "all crimes," and § 3 limited both the definition of "Treason" and its historical disqualification penalties. The Fifth Amendment required prosecution by indictment for any "infamous" crime, with all the attendant guarantees of a full criminal trial. At common law, "infamy" implied incompetence to testify, but a series of Supreme Court decisions strongly indicate that the Indictment Clause would come into play whenever Congress passes a categorical rights-disqualification law. *See*, *e.g*., *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 377-81 (1866)(exclusion from practice of law based on prior disloyalty is punishment.); *United States v. Waddell*, 112 U.S. 76, 82 (1884)

(recognizing, but declining to decide, a "very serious question" – whether disqualification from federal office is an infamous punishment); *Ex parte Wilson*, 114 U.S. 417, 423, 426 (1885)(describing and competence to testify and disqualification from federal office as infamous penalties); *see also Ullman v. United States*, 350 U.S. 422, 451 n. 5 (1956) (Black, J., dissenting)("The guarantee of jury trial and the prohibition of Bills of Attainder place beyond the pale the imposition of infamy or outlawry by either the Executive or the Congress."). It is incongruous to suppose that the Second Amendment effectively incorporated disarmament practices of the pre-ratification era, while measures stripping other rights were ended by other provisions of the Constitution and Bill of Rights. It is especially incongruous considering the plain text of the Second Amendment and that the limitations and conditions found in the English Bill of Rights and suggested in some state ratification conventions were considered and rejected.

Congress and more than a few states passed several laws protecting privately owned firearms from distressed sales – thus preserving continued gun possession by irresponsible and/or law-breaking citizens. 1 Stat. 272 (1792); *see also* 1715 Md. Acts. Ch. 40, ¶ 5, in 1 Kilty's Laws 1799; 1757 Va. Laws ch. 3, ¶ 15, in 7 Hening's Stat. at Large 100; 1784-1785 Mass. Acts &

Resolves ch. 46, p. 516; 1703 Del. Acts ch. 36, § 4 in 2 Del Laws 1137 (1797); 1807 Pa. Acts. Ch. 2,854, § 15 in 18 Pa. Stat. at Large 595-96 (1915); 1821 Conn. Pub. Stat. Laws 56. These contribute to a historical tradition indicating the unconstitutionality of § 922(g)(1) as applied to Goins.

After ratification states began to regulate firearms misuse and the manner of public carry, *Bruen*, 142 S.Ct. at 2145, but American governments continue to observe a "zone of immunity" for "the people" surrounding their private ownership and possession of firearms in the home. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007). In this our new nation shared the principle recognized in English common law that a man's home is his castle.

The district court noted that "[s]ome courts have seized upon the severity of felon punishment during the founding era to justify excluding modern felons from the scope of the Second Amendment." 647 F.Supp.3d at 550, *citing Folajtar v. Attorney General*, 980 F.3d 897, 905 (3rd Cir. 2020), *cert. denied*, 141 S.Ct. 2511 (2021). The district court, as did the *en banc* Third Circuit in *Range v. Attorney General*, found this historical record too fragmented to establish reliably a historical tradition.

"England and Scotland punished several crimes, both violent and nonviolent with death." 647 F.Supp.3d at 549, *citing Folajtar*, 980 F.3d at 904**.** "It is true that 'founding-era practice' was to punish some 'felony offenses with death.'" *Range*, 69 F.4th at 105 (citation omitted). "Felonies historically carried a harsh civil penalty as well" including forfeiture of all property then owned, along with the ability to own property in the future and to bequeath it to any descendants. 647 F.Supp.3d at 550.

The district court concluded correctly that these practices did not take hold in our new nation. "The civil consequences" of a felony conviction "did not follow the colonists to America in their strict English form.'" *Id.*, *citing* C.K. Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Harv. J.L. & Pub. Pol'y 695, 715 (2009)(C.K. Marshall, *Martha Stewart*). Furthermore, "[i]t is also unclear that the colonies in early states universally applied the death penalty to felonies. *Id.* at 550. "All this is to say that "'those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of the law.'" *Id.* at 550-51, *quoting Kanter*, 919 F.3d at 459 (Barrett, J., dissenting).

The *en banc* Third Circuit also considered these historical practices in *Range*, and, like the district court, found that they did not provide

historical analogues supporting the constitutionality of § 922(g)(1). First, the Third Circuit rejected the argument that imposition of the death penalty for nonviolent crimes in the early years of our new nation supported lifetime disarmament. "That founding-era governments punish some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue – lifetime disarmament – is rooted in our Nation's history and tradition." 69 F.4th at 105. (emphasis in original). "The greater does not necessarily include the lesser: founding-era governments execution of some individuals convicted of certain offenses does not mean the state, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* Furthermore, "a felon could 'repurchase arms' after successfully completing his sentence and re-integrating into society." *Id.* (citation omitted). Furthermore, "founding-era laws often prescribe the forfeiture of the weapon used to commit a firearm - related offense without affecting the perpetrator's right to keep and bear arms generally." *Id.* (citation omitted). Finally, "government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession." *Id.*

The district court correctly concluded, as later did the *en banc* Third Circuit, that founding-era practices regarding the treatment of felons do not

establish a historical analogues supporting the lifetime ban on firearm

possession represented by § 922(g)(1).

### (D)    Felon in possession laws appeared in only the 20th century

The district court did not and could not cite any such laws from the

Founding era, because none exist. Statutes prohibiting felons from

possessing firearms did not appear until the 20th century. "[O]ne can with a

good degree of confidence say that bans on convicting possessing firearms

was unknown before World War I." C.K. Marshall, *Martha Stewart*, *supra*,

32 Harv. J.L & Pub. Pol'y  at 708; Royce de R. Barondes, *The Odious

Intellectual Company of Authority Restricting Second Amendment Rights

to the "Virtuous*," 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of

"any direct authority whatsoever" for the view that felons were "deprived of

firearm rights" at the Founding). As Judge Sutton has noted, § 922(g)(1)

dates only to 1938. *Tyler v. Hillsdale Cnty. Sheriff's Office*, 837 F.3d 678,

708 (6th Cir. 2016)(Sutton, J., concurring).

Founding-era laws, statutes or ordinances prohibiting felons from

possessing firearms would be the best evidence of a "historical tradition of

firearm regulation" consistent with § 922(g)(1), but "scholars have not been

able to identify any such laws." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir.

209)(Barrett, J., dissenting). "[N]o colonial or state law in eighteenth

century America formally restricted the ability to own firearms." Larson, *Four Exceptions,* 60 Hastings L.J. at 1374. "In sum, felon disarmament laws significantly postdated both the Second Amendment and the Fourteenth Amendment." *Id*. at 1376.

Felon in possession laws like § 922(g)(1) are creations of the 20th century; they are not part of our Nation's historical tradition of firearm regulation. Moreover, there are no "distinctly similar" to § 922(g)(1), as applied to Goins, firearm laws or regulations that are part of our Nation's tradition of firearm regulation.

**(E)    No "distinctly similar" historical analogues support Goins's prosecution and the general standard articulated by the district court would grant Congress virtual *carte blanche* to ban and punish the exercise of a fundamental, enumerated right**

The major error in the district court's analysis is that it applied a "relevantly similar" standard instead of a "distinctly similar" standard to compare historical analogues to § 922(g)(1) and, as a result, relied on a collection of disparate historical regulations of discrete groups to derive a historical tradition of disarming what is described with an excessively high level of generality: "those who pose a danger to public safety."

This broad-brush analogizing cannot be reconciled with *Bruen*. *Bruen* instructs that in carving out exceptions to "the Second Amendment's unqualified command," 142 S.Ct. at 2126, courts should proceed cautiously,

defining those exceptions narrowly and concretely to ensure they are in fact consistent with America's historical tradition of firearm regulation.

*Bruen* illustrates this cautious approach. There, New York relied, to support its proper-cause requirement, on several English and early American firearms regulations that it claimed to demonstrate a "sweeping" power to enact "broad prohibitions on all forms of public carry." *Id.* at 2139, 2145. First, New York pointed to the 1328 Statute of Northampton, which prohibited bringing "force in affray of the peace" and "go[ing] [] or rid[ing] armed by night [] or by day," as well as colonial and early-Republic statutes prohibiting similar conduct. *Id.* at 2139, 2142-46. Second, New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. Third, New York compared the proper-cause requirement to mid-19th century surety statutes, which "required any person who is reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.* at 2148.

Even while conceding that the right to keep and bear arms in public has traditionally been subject to certain "well-defined restrictions," *Bruen* rejected New York's argument that its collection of discrete historical

41

regulations amounted to a tradition of broadly prohibiting public carry, or of conditioning it on a special need for self-defense. *Id.* at 2156. Furthermore, the Court read each of these laws narrowly, stating that the Statute of Northampton regulated public carry only to the extent that someone was "bearing arms in a way that spread [] 'fear' or 'terror'" antebellum courts upheld public concealed-carry bands only insofar as "they did not similarly prohibit *open* carry"; and surety statutes "presumed" individuals had a general right to public carry that could be burdened only in limited circumstances. *Id.* at 2145-48 (emphasis in original). Accordingly and notwithstanding that founding-era laws prohibit "particular mode[s]" of public carry, the Court declined to conclude that legislatures may enact a "*general* prohibition" on *all* modes of public carry or may "ban public carry altogether." *Id.* at 2146-47 & n. 19 (emphasis altered).

The same logic applies to statutes that can be generally described as disarming "those who pose a danger to public safety." The district court cited founding-era regulations disarming discrete groups based on status – Catholics, perceive loyalists, Native Americans, Blacks, slaves – often for discrete periods, and deduced a historical tradition of permanently disarming all those who were deemed to "pose a danger to public safety." It then asserted that Goins's felony convictions increased his potential for

further crimes and thus identified him as one posing a danger to public safety. 647 F.Supp.3d at 554-55. *Bruen* rejects such overgeneralization, while commanding that exceptions to the Second Amendment's "unqualified command" be "well-defined." *Id.* at 2130, 2156.

A category of persons deemed to "pose a danger to public safety" is not well-defined. The historical analogues referred to by the district court illustrate how abusively the label could be applied. It could be inferred from the district court's linkage of Goins's felony convictions to his potential for further crimes that those who "pose a danger to public safety" includes perhaps all felons. Felonies, nowadays, however, "include a wide swath of crimes, some of which seem minor." *Range*, 69 F.4th at 102. "And some misdemeanors seem serious." *Id*. The Supreme Court itself has recognized the ambiguity between the two: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, 141 S.Ct. 2011, 2020 (2021)(cleaned up).

The district court's approach entails excessive and misplaced deference to Congress. The Supreme Court emphatically emphasized in *Bruen* that judicial "defer[ence] to the determinations of legislatures" "is not" "appropriate" in Second Amendment litigation. 142 S.Ct. at 2131. Nowhere else do courts allow legislatures to deny enumerated rights and

that approach renders the Second Amendment "a second-class right." *Id*. at 2156. Such "'deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label.'" *Range*, 69 F.4th at 102, *quoting Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). "The government could quickly swallow the right if it had broad power to designate any group is dangerous and thereby disqualify its members from having a gun." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting). Finally, such deference to the legislature "would contravene Heller's reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" *Range*, 69 F.4th at 103, *quoting Heller*, 554 U.S. at 636.

*Bruen* shows the path forward. Goins was charged and prosecuted for possession in his home a firearm for self-defense. There are no "distinctly similar" historical analogues to this application of § 922(g)(1). It is inconsistent with our Nation's historical tradition firearm regulation.

## Conclusion

For all the foregoing reasons, the judgment of the district court should be vacated and reversed and the indictment ordered dismissed.

Respectfully Submitted,

By: /s/ Robert L. Abell
ROBERT L. ABELL
PO Box 983
Lexington, KY 40588

COUNSEL FOR APPELLLANT
CHRISTOPHER GOINS

## Certificate of Service

I hereby certify that the foregoing was electronically filed with the Sixth Circuit's electronic filing system this 7th day of November 2023, that notice will be sent electronically by that system to All Counsel of Record.

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

## Certification of Compliance
## Pursuant to FRAP 32(a)(7)(B)

1. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 9,570 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-5848

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CHRISTOPHER GOINS,

Defendant-Appellant

---

Appeal from the United States District Court
For the Eastern District of Kentucky at Lexington
Criminal Action No. 5:22-cr-91-S
Hon. Gregory F. Van Tatenhove

---

DESIGNATION OF DISTRICT COURT DOCUMENTS
PURSUANT TO 6 CIR. R. 30

---

| Description of Documents | Record Entry # | Page ID# |
|---|---|---|
| Indictment | 1 | 1 |
| Superseding Indictment | 22 | 109 |
| Judgment | 68 | 387 |
| Notice of Appeal | 69 | 394 |
| Motion to Dismiss | 15 | 38 |
| Memorandum Supporting Motion to Dismiss | 15-1 | 40 |

A

| | | |
|---|---|---|
| Reply Memorandum Supporting Motion to Dismiss | 19 | 67 |
| Order | 20 | 83 |
| Exhibit (Fayette Circuit judgment) | 21-1 | 99 |
| Supplemental Reply Memorandum | 26 | 118 |
| Motion to Dismiss Superseding Indictment | 28 | 128 |
| Opinion & Order | 32 | 173 |
| Conditional Plea Agreement | 58 | 327 |
| Transcript | 75 | 472 |

## Counsel's Certification

I hereby certify that the foregoing documents are included in the district court's electronic record.

/s/ Robert L. Abell
Counsel for Appellant