No. 23-5848

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

CHRISTOPHER GOINS,
Defendant-Appellant.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
No. 5:22-CR-91 (Van Tatenhove, J.)

———————————

**ANSWERING BRIEF FOR APPELLEE**

———————————

CARLTON S. SHIER, IV
United States Attorney

CHARLES P. WISDOM, JR.
Chief, Appellate Division

EMILY K. GREENFIELD
Assistant United States Attorney
Eastern District of Kentucky

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel: (202) 615-1170
Mahogane.Reed@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................iii

STATEMENT REGARDING ORAL ARGUMENT ................................ xvi

JURISDICTIONAL STATEMENT ............................................. 1

STATEMENT OF THE ISSUE ..................................................... 1

STATEMENT OF THE CASE ...................................................... 1

    I.    Procedural History...................................................... 1

    II.    Relevant Facts ............................................................ 2

          A.    Goins, a Convicted Felon, Straw-Purchases a Firearm From a Pawn Shop. ........................................................... 2

          B.    Goins Pleads Guilty to Possession of a Firearm by a Felon, and the District Court Sentences Him to Six Months of Imprisonment. .................................................... 3

    III.    Ruling Under Review ................................................. 6

SUMMARY OF ARGUMENT ..................................................... 6

ARGUMENT...................................................................................... 8

    THE DISTRICT COURT PROPERLY HELD THAT SECTION 922(G)(1) DOES NOT VIOLATE THE SECOND AMENDMENT. ........................................................................ 8

          A.    Standard of Review .......................................................... 8

          B.    *Bruen* Did Not Abrogate This Court's Pre-Existing Decisions Upholding Section 922(g)(1) Under the Second Amendment. ......................................................... 8

               1.    Following *Heller*, this Court repeatedly upheld Section 922(g)(1) under the Second Amendment. ........................................................... 8

i

2.    *Bruen* does not call this Court's prior decisions
into question. ........................................................ 10

C.    Even if *Bruen* Abrogated this Court's Felon-
Dispossession Precedents, Goins's Second
Amendment Challenge Fails. ........................................... 16

1.    The Second Amendment's text and historical
context confirm that felons can be disarmed. ........... 16

2.    Our nation's historical tradition justifies
disarming felons. ..................................................... 25

3.    Goins's contrary arguments lack merit. .................. 38

4.    Section 922(g)(1) is constitutional as applied to
Goins. ................................................................... 42

CONCLUSION ........................................................................ 47

DESIGNATION OF DISTRICT COURT DOCUMENTS ........................ 48

CERTIFICATE OF COMPLIANCE ............................................... 49

CERTIFICATE OF SERVICE ..................................................... 50

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ky. v. McCreary Cnty., Ky.*,
607 F.3d 439 (6th Cir. 2010) .................................................. 12

*Barrett v. United States*,
423 U.S. 212 (1976) ............................................................... 38

*Baze v. Rees*,
553 U.S. 35 (2008) ................................................................. 26

*Begay v. United States*,
553 U.S. 137 (2008) ............................................................... 42

*Dickerson v. New Banner Institute, Inc.*,
460 U.S. 103 (1983) ...........................................................25, 38

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ....................................................... *passim*

*Florence v. Board of Chosen Freeholders*,
566 U.S. 318 (2012) ............................................................... 45

*Folajtar v. Attorney General*,
980 F.3d 897 (3d Cir. 2020)................................................... 45

*Hamilton v. Pallozzi*,
848 F.3d 614 (4th Cir. 2017) .............................................25, 37

*Harmelin v. Michigan*,
501 U.S. 957 (1991) ............................................................... 45

*Kanter v. Barr*,
919 F.3d 437 (7th Cir. 2019) ................................................. 28

*Lewis v. United States*,
445 U.S. 55 (1980) ................................................................. 38

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..........................................................................11, 22

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) .........................................................18, 25

*Mitchell v. Wisconsin*,
  139 S. Ct. 2525 (2019).......................................................................... 42

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022)...................................................................... *passim*

*Patterson v. Winn*,
  30 U.S. (5 Pet.) 233 (1831) ................................................................... 31

*Respublica v. Donagan*,
  2 Yeates 437 (Pa. 1799)......................................................................... 34

*Richardson v. Ramirez*,
  418 U.S. 24 (1974) ................................................................................ 18

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) .............................................................................. 16

*Smith v. United States*,
  508 U.S. 223 (1993) .............................................................................. 45

*Spencer v. Kemna*,
  523 U.S. 1 (1998).................................................................................. 18

*State v. Davis*,
  5 S.C.L. (3 Brev.) 3 (S.C. Const. Ct. App. 1811) ...................................... 34

*State v. Hogan*,
  58 N.E. 572 (Ohio 1900)....................................................................... 37

*State v. Shelby*,
  2 S.W. 468 (Mo. 1886).......................................................................... 36

*Tennessee v. Garner*,
  471 U.S. 1 (1985).................................................................................. 26

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
    837 F.3d 678 (6th Cir. 2016) ............................................................18, 21

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011)................................................................ 19

*United States v. Blackwell-Esters*,
    No. 22-cr-20287, 2023 WL 7093806 (E.D. Mich. Oct. 26, 2023) .............. 14

*United States v. Brown*,
    No. 22-cr-704, 2023 WL 7323335 (N.D. Ohio Nov. 7, 2023) ................... 14

*United States v. Carey*,
    602 F.3d 738 (6th Cir. 2010) ...........................................................7, 9, 13

*United States v. Carpio-Leon*,
    701 F.3d 974 (4th Cir. 2012) ................................................................. 19

*United States v. Carter*,
    750 F.3d 462 (4th Cir. 2014) ................................................................. 45

*United States v. Carter*,
    No. 22-cr-20477, 2023 WL 3319913 (E.D. Mich. May 9, 2023) .............. 15

*United States v. Deryke*,
    No. 23-cr-92, 2023 WL 7101902 (W.D. Mich. Oct. 27, 2023) ................. 14

*United States v. Frazier*,
    314 F. App'x 801 (6th Cir. 2008)........................................................ 9, 13

*United States v. Gleaves*,
    --- F. Supp. 3d ---, 2023 WL 1791866 (M.D. Tenn. Feb. 6, 2023).............. 15

*United States v. Goolsby*,
    No. 21-3087, 2022 WL 670137 (6th Cir. Mar. 7, 2022) ........................... 10

*United States v. Greeno*,
    679 F.3d 510 (6th Cir. 2012) ................................................................. 13

*United States v. Griffin*,
    476 F. App'x 592 (6th Cir. 2011)........................................................... 10

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022)................................................................. 22

*United States v. Kelly*,
    No. 22-CR-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ............ 41

*United States v. Khami*,
    362 F. App'x 501 (6th Cir. 2010)........................................................10, 12

*United States v. Loney*,
    331 F.3d 516 (6th Cir. 2003) ....................................................................... 8

*United States v. McNeil*,
    No. 23-cr-20229, 2023 WL 6627972 (E.D. Mich. Oct. 11, 2023) ............. 14

*United States v. Miller*,
    No. 22-cr-645, 2023 WL 6065116 (N.D. Ohio Sept. 18, 2023) ................. 14

*United States v. Nailor*,
    No. 23-cr-20076, 2023 WL 6049746 (E.D. Mich. Sept. 15, 2023)............. 14

*United States v. Napier*,
    233 F.3d 394 (6th Cir. 2000) ..................................................................... 11

*United States v. Nelson*,
    --- F. Supp. 3d ---, 2023 WL 4249367 (E.D. Mich. June 29, 2023) ............ 15

*United States v. Noble*,
    762 F.3d 509 (6th Cir. 2014) ..................................................................... 12

*United States v. Omar*,
    No. 22-cr-182, 2023 WL 7526045 (S.D. Ohio Nov. 14, 2023) ................. 13

*United States v. Parker*,
    No. 22-cr-82, 2023 WL 3690247 (W.D. Ky. May 26, 2023) ..................... 15

*United States v. Ross*,
    No. 23-cr-20168, 2023 WL 7345908 (E.D. Mich. Nov. 7, 2023).............. 14

*United States v. Smith*,
    No. 22-cr-20351, 2023 WL 2215779 (E.D. Mich. Feb. 24, 2023)............. 15

*United States v. Taylor*,
No. 23-cr-289, 2023 WL 5957107 (N.D. Ohio Sept. 12, 2023) ................. 14

*United States v. Vaughn*,
No. 23-5790, Order (6th Cir. Sept. 28, 2023) .......................................... 15

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) ................................................................................ 20

*United States v. Vongxay*,
594 F.3d 1111 (9th Cir. 2010) .................................................................. 19

*United States v. Whisnant*,
391 F. App'x 426 (6th Cir. 2010) .............................................................. 9

*United States v. Yancey*,
621 F.3d 681 (7th Cir. 2010) .................................................................... 19

*Vincent v. Garland*,
80 F.4th 1197 (10th Cir. 2023) ................................................................ 15

*Virginia v. Harris*,
558 U.S. 978 (2009) ................................................................................ 43

## Constitutional Provisions

U.S. Const. amend. II ............................................................................... 16

U.S. Const. amend. X ............................................................................... 20

U.S. Const. amend. XVII ......................................................................... 20

U.S. Const. art. I, § 2, cl. 1 ...................................................................... 20

## Federal Statutes

18 U.S.C. § 2 ............................................................................................ 3

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 922 ................................................................................ 1, 3, 21

18 U.S.C. § 924 ................................................................. 3

28 U.S.C. § 1291 ............................................................... 1

28 U.S.C. § 1865 .............................................................. 18

**State Statutes**

Ky. Rev. Stat. § 237.110 ................................................. 24

La. Stat. § 40:1379.3 ....................................................... 24

Miss. Code. Ann. § 45-9-101 .......................................... 24

Ohio Rev. Code Ann. § 2923.125 ................................... 24

Tex. Gov't Code § 411.172 ............................................. 24

**Other Authorities**

1 Richard Burn, The Justice of the Peace, and Parish Officer (2d ed. 1756) ............................................................................. 30

1 William Hawkins, A Treatise of the Pleas of the Crown (1716) ................. 30

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971) .............. 32

2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* (6th ed. 1756) ............................................................ 30

4 *Journals of the Continental Congress* 1774-1789 (Worthington Chauncey Ford ed., 1906) ........................................... 28

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769) ....................................................... 25, 26, 30, 34

6 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2000) ......................................................................... 33

Akhil Reed Amar, *The Bill of Rights* (1998) ................... 17

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ................................................................... 27

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702* (Feb. 26, 1701) (Edward Bateson ed., 1937) ...................................................................... 30

Charles C. Branas, *Alcohol Use & Firearm Violence*, 38 EPIDEMIOLOGIC REVS. 32 (2016) .................................................. 43

David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ................ 27

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397 (2019) ................................................................. 30

*Drug Use and Crime*, Bureau of Justice Statistics (June 1, 2021) ..................... 46

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792) ...................................................................... 31

G. Jacob, *Lex Constitutionis* (2d ed. 1737) ...................................... 30

Giles Jacob, *The Modern Justice* (1716) ........................................ 30

James Davis, *The Office and Authority of a Justice of Peace* (1774) .................... 31

James Parker, *Conductor Generalis* (1764) ...................................... 31

James Parker, *Conductor Generalis* (Robert Campbell printing 1792) ............. 31

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) .................. 31

John Holmes, *The Statesman, or Principles of Legislation and Law* (1840) .......... 33

John Roman, Wendy Townsend, & Avinash Singh Bhati, *Recidivism Rates for Drug Court Graduates* (2003) .......................................... 46

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .....28, 29

Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* (1858) ................................................................. 34

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773) .......................................................................... 31

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ................................................................. 31

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* (John P. Kaminski & Gaspare J. Saladino eds., 2001) ........................................................................................ 33

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* (1897) .............................................................................. 30

Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* (1905) ................. 30

Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* (1885) ............. 30

Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (2019) ........................... 35

Robert Gardiner, *The Compleat Constable* (3d ed. 1708) ................................. 30

Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 J. OF AM. MED. ASS'N: INTERNAL MED. 37 (2019) ................................................................. 44

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 .......................................................................... 33

Stuart Banner, *The Death Penalty: An American History* (2002) ........................ 26

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* (New Haven, Oliver Steele 1816) ............................................ 34

Theodore Barlow, *The Justice of Peace* (1745)................................................. 30

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* (1868)................................................................................................................ 17

*Traffic Safety Facts: 2004 Data*, Nat'l Highway Traffic Safety Ass'n................. 43

W. Nelson, *The Office and Authority of a Justice of Peace* (7th ed. 1721)............. 30

William Waller Hening, *The New Virginia Justice* (1795)................................. 31

## Historical Statutes

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879) .............................. 35, 36

1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* (1811) ..................................................................................... 27

1 W. & M. Sess. II, c. 2 (1688) (Eng.) .......................................................... 29

1702 Conn. Acts 91 ..................................................................................... 34

2 Edw. 3, c. 3 (1328) (Eng.) ........................................................................ 30

2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785-1788) ............................................................................................. 27

9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* (1821)..................... 27

*Act About Binding to the Peace*, ch, 26, 1700 Pa. Laws 5 .................................. 34

*Act About Binding to the Peace*, ch. 4, 1700 Del. Laws 52................................. 34

*Act Declaring the Mode of Proceeding in Certain Criminal Cases*, ch. 30, § 16, 1789 Va. Laws 17-18 ............................................................... 34

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed., 1862) ..................... 28

Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* (Walter Clark ed., 1905) ................................................................................ 28

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ..................................... 35

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157................. 35

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73................................................... 35

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ............................... 36

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290.......... 36

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34................................................... 36

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) ........................... 35

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ................. 36

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 ................................... 36

Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* (Charles J. Hoadly ed., 1890) ................. 28

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1906)........................................................ 32

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14.............................. 35

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ................................. 35

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ...................... 36

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* (1815) ......... 32

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ....................................... 35

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25 ........................... 36

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ................................... 35

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59.................................... 35

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ...........................35, 36

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87.................35, 36

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ....................................... 35

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117............................................ 35

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112 ....................................... 35

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ........................................... 36

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert
  Stillman Batchellor ed., 1904) ................................................ 31

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144...................... 35

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890)........................ 32

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355...................... 36

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws
  140 .......................................................................... 36

Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New York* (2d ed.
  1807)......................................................................... 32

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ..................................... 35

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80......................................... 35

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) ........................ 36

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ........................ 36

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ............................. 36

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 .................................... 35

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274 ......................... 36

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ....................35, 36

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ......................... 35

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of
the Province of Massachusetts Bay* (1886) ...................................................... 28

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 ............................... 35

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All
the Laws of Virginia, from the First Session of the Legislature, in the Year
1619* (William Waller Hening ed., 1821) ................................................... 28

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 .................................. 35

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 ...................................... 36

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297 ................ 36

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of
Massachusetts Bay* (1869) .......................................................................... 31

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ................. 35

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 ................... 36

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 .............. 35

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General
Assembly of Virginia, of a Public and Permanent Nature, as are now in
Force* (1794) .............................................................................................. 32

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the
State of New-Jersey* 90 (1777) ....................................................................... 28

*Acts and Laws of The English Colony of Rhode Island and Providence-
Plantations in New-England in America* (1767) .............................................. 27

*An Act for the Punishment of Certain Crimes Against the United States*, 1
    Stat. 112-15 (1790) ................................................................. 26

Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock &
    William Johnson eds., 1873) ................................................. 35

Mass. Rev. Stat. ch. 134, § 16 (1836) ............................................ 34

Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13 ................................... 29

Miss. Rev. Code ch. 77, § 2964 (1880) ......................................... 36

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland,*
    *1638-1674* (E.B. O'Callaghan ed., 1868) ............................... 32

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from*
    *1682-1801* (1902) ................................................................. 28

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose the appellant's request for oral argument.

# JURISDICTIONAL STATEMENT

Defendant-appellant Christopher Goins appeals from a final judgment of conviction in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The court entered its judgment on September 21, 2023. Judgment, R.68, #387-393.[1] Goins filed a timely notice of appeal. Notice of Appeal, R.69, #394. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(1)'s prohibition on the possession of firearms by felons violates the Second Amendment as applied to the defendant.

# STATEMENT OF THE CASE

## I.    Procedural History

Following a conditional guilty plea in the United States District Court for the Eastern District of Kentucky, Christopher Goins was convicted of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Conditional Plea, R.58, #327-333; Judgment, R.68, #387. The district court sentenced Goins to six

---

[1] References to the record are cited as "(Document description), (docket entry number) #(PAGE ID)." "Br." refers to Goins's opening brief.

months of imprisonment, to be followed by three years of supervised release. Judgment, R.68, #388-389.

## II.   Relevant Facts

### A.   Goins, a Convicted Felon, Straw-Purchases a Firearm From a Pawn Shop.

In December 2021, Goins visited a pawn shop in Lexington, Kentucky, and shopped for two AR-style semi-automatic pistols. Conditional Plea, R.58, #328. Goins returned to the pawn shop the following day with a friend, whom Goins had asked to buy one of the pistols he had seen the day before. Conditional Plea, R.58, #328-329. Goins's friend bought the pistol as requested and gave it to Goins in the pawn shop parking lot. Conditional Plea, R.58, #329. The transfer was captured on video surveillance, and the pawn shop owners alerted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Conditional Plea, R.58, #329. Goins later admitted to an ATF agent that he possessed the pistol and that he had asked his friend to buy the gun for him because Goins could not pass the background check. Conditional Plea, R.58, #329. About a week after purchasing the pistol, Goins returned it to ATF. Conditional Plea, R.58, #329.

At the time he possessed the firearm, Goins had two state felony convictions from 2019: one for his fourth offense of operating a motor vehicle while under the influence of alcohol or drugs, and one for possessing a controlled

2

substance. Presentence Investigation Report ("PSR"), R.72, #407. He was on probation for these offenses at the time of his firearm possession and arrest in this case. PSR, R.72, #407. Goins also had multiple additional misdemeanor convictions, including for possessing marijuana, operating a motor vehicle while under the influence of drugs or alcohol (three additional times, in 2011, 2012, and 2017), driving with a suspended license, public intoxication, criminal mischief, and receiving stolen property. PSR, R.72, #404-407.

B.    <u>Goins Pleads Guilty to Possession of a Firearm by a Felon, and the District Court Sentences Him to Six Months of Imprisonment.</u>

A grand jury in the Eastern District of Kentucky returned an indictment charging Goins with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1).[2] Indictment, R.1, #1.

Goins moved to dismiss the indictment, arguing that Section 922(g)(1) violated the Second Amendment as applied to him. Motion to Dismiss, R.15, #38; Memorandum in Support, R.15-1, #40-49. Goins contended that *New York*

---

[2] The grand jury later returned a superseding indictment adding a count for making a false statement to a federal firearms dealer, in violation of 18 U.S.C. §§ 924(a)(1)(A) and 2. Superseding Indictment, R.22, #109-110. The government alleged that Goins's friend falsely represented in ATF Form 4473 that he was purchasing the firearm for himself, not for another person, and that Goins aided and abetted this offense. *See* Superseding Indictment, R.22, #109-110. The district court dismissed that count on the government's motion at Goins's sentencing hearing. *See* Judgment, R.68, #387.

*State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), abrogated this Court's pre-existing precedent upholding Section 922(g)(1) under the Second Amendment. Memorandum in Support, R.15-1, #44-46. And he argued that Section 922(g)(1) failed under *Bruen* because there were no Founding-era precursors that specifically disarmed felons. Memorandum in Support, R.15-1, #46-48. The government responded that *Bruen* did not abrogate pre-existing precedent upholding Section 922(g)(1). Response, R.16, #55-57. And assuming it did, the government explained that the right conferred by the Second Amendment extended only to law-abiding citizens, not to felons, who were not among "the people" under the Amendment. Response, R.16, #55-58. The government also explained that Section 922(g)(1) was consistent with our nation's historical tradition of firearm regulation. Response, R.16, #59-60.

After Goins's motion was submitted, the district court ordered additional briefing on "whether the history and tradition surrounding the Second Amendment justifies disarming both violent and non-violent felons." Order, R.20, #87. In its response, the government argued that historical laws disarming loyalists, laws subjecting felons to capital punishment and estate forfeiture, and Founding-era precursors to the Second Amendment, among other historical sources, were historical precursors to Section 922(g)(1) and justified disarming all felons. Response, R.21, #88-92. And the government argued that, in any

event, Goins's offenses were serious enough to warrant disarming him. Response, R.21, #92-96.

The district court denied Goins's motion to dismiss. Opinion, R.32, #173-199. The court determined that *Bruen* abrogated this Court's pre-existing precedent upholding Section 922(g)(1). Opinion, R.32, #175-179. The court also determined that, notwithstanding his status as a felon, Goins was covered by the Second Amendment's text. Opinion, R.32, #179-186. But the district court concluded that "[h]istory supports Congress's decision to strip Mr. Goins of his right to bear arms." Opinion, R.32, #186. The court explained that "Congress can base the decision to disarm a class of people upon modern judgments as to 'the categories of people whose possession of guns would endanger the public safety.'" Opinion, R.32, #196-197. Based on this historically sourced legislative authority, the court concluded that "[t]here is little reason to doubt that Congress could have deemed Mr. Goins to represent a threat to public safety, consistent with the Second Amendment's history and tradition." Opinion, R.32, #197. According to the court, "Mr. Goins's criminal record shows several reasons to suspect that an armed Christopher Goins could make the public less safe": Goins's "fourth DUI conviction evinces a willingness to disregard the harm that his actions could inflict upon the public," and his conviction for drug possession "flag[s] him as having an above average chance of committing further crimes."

Opinion, R.32, #198-199. Based on this determination, the district court held that Goins's criminal history "represent[s] a . . . serious and direct threat to public safety" and denied Goins's motion to dismiss. Opinion, R.32, #199.

Following the court's ruling, Goins pleaded guilty to the Section 922(g)(1) charge but preserved his right to appeal the district court's order denying his motion to dismiss. Conditional Plea, R.58, #330-331. The district court imposed a below-Guidelines sentence of six months of imprisonment, to be followed by three years of supervised release.[3] Judgment, R.68, #388-389.

## III.    Ruling Under Review

Goins challenges the district court's denial of his motion to dismiss. Opinion, R.32, #173-199.

## SUMMARY OF ARGUMENT

The district court correctly denied Goins's motion to dismiss. Goins's Second Amendment challenge to Section 922(g)(1) is foreclosed by this Court's precedent unambiguously holding, based on the Supreme Court's reasoning in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), that the federal felon-in-possession statute does not violate the Second Amendment. *See United States v.*

---

[3] Goins's PSR calculated an advisory Guidelines range of 30-37 months of imprisonment based on a total offense level of 17 and a Criminal History Category of III. PSR, R.72, #413.

*Carey*, 602 F.3d 738, 741 (6th Cir. 2010). The Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), did not alter that Court's endorsement of felon-dispossession statutes in *Heller*—a point several Justices emphasized in concurrence. *Carey* therefore remains binding precedent, as this Court and multiple district courts within this circuit have recognized. Under that precedent, the district court's judgment should be affirmed.

Even considering Section 922(g)(1)'s constitutionality anew under *Bruen*, however, the provision remains constitutional. The Second Amendment's text permits dispossessing felons, both because felons may be excluded from the political community, and because the Amendment codified a pre-existing right that excludes felons. *Heller*'s and *Bruen*'s authoritative interpretations of the right as extending to "law-abiding citizens," which necessarily excludes felons, confirms this historical understanding.

Section 922(g)(1) is also consistent with our nation's historical tradition of firearm regulation. Several historical precursors to Section 922(g)(1)—including felony-punishment laws subjecting those who committed serious crimes to death or estate forfeiture; historical laws disarming other criminal offenders and loyalists; and laws disarming persons whose firearm possession posed a danger to society—establish that Congress may lawfully disarm all felons, whose status

as serious criminal offenders supports Congress's legislative judgment that their firearm possession is contrary to the public interest.

At a minimum, the district court properly determined that history supports Section 922(g)(1)'s constitutional application to Goins, whose felony convictions for a fourth DUI offense and possession of controlled substances leave "little reason to doubt" that Congress could have deemed him a threat to public safety. Opinion, R.32, #197. This Court should affirm the district court's judgment.

## ARGUMENT

## THE DISTRICT COURT PROPERLY HELD THAT SECTION 922(G)(1) DOES NOT VIOLATE THE SECOND AMENDMENT.

### A.    Standard of Review

This Court reviews the denial of a motion challenging the constitutionality of a statute de novo. *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).

### B.    *Bruen* Did Not Abrogate This Court's Pre-Existing Decisions Upholding Section 922(g)(1) Under the Second Amendment.

#### 1.    Following *Heller*, this Court repeatedly upheld Section 922(g)(1) under the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is

not unlimited." *Id*. at 626. And it said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id*. at 626-27 & n.26.

After *Heller*, this Court held on plain-error review that Section 922(g)(1) does not violate the Second Amendment. *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008) (unpublished). *Frazier* relied on *Heller*'s statements that the individual right to bear arms "is not unlimited" and that nothing in that decision should be taken to cast doubt on "longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626-27, to conclude that "congressional regulation of firearms," including Section 922(g)(1), "[is] constitutional." *Frazier*, 314 F. App'x at 807 (citing cases). After *Frazier*, this Court again affirmed Section 922(g)(1)'s constitutionality in a published decision, concluding that because the Second Amendment right "is not unlimited," and "in fact. . . is specifically *limited* in the case of felon prohibitions," "Congress's prohibition on felon possession of firearms is constitutional." *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010). Since then, this Court has consistently applied *Heller* and *Carey* to deny Second Amendment challenges to Section 922(g)(1). *See United States v. Whisnant*, 391 F. App'x 426, 430 (6th Cir. 2010) (unpublished) (discussing *Heller* and observing

that "this Court has held that § 922(g)(1) comports with the Second Amendment"); *United States v. Khami*, 362 F. App'x 501, 507-08 (6th Cir. 2010) (unpublished) (relying on *Heller* to reject Second Amendment challenge to Section 922(g)(1)); *United States v. Griffin*, 476 F. App'x 592, 598 (6th Cir. 2011) (unpublished) (same); *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *2-3 (6th Cir. Mar. 7, 2022) (unpublished) (same).

      2.    <u>*Bruen* does not call this Court's prior decisions into question.</u>

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home because the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id*. at 2122, 2156.

*Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125-26. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. But the Court

"decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* then "reiterate[d]" the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. It explained that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. And when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

This Court's decisions applying *Heller* to uphold Section 922(g)(1) are consistent with *Bruen* and therefore remain binding. *See United States v. Napier*, 233 F.3d 394, 397 (6th Cir. 2000) (treating precedent as binding "unless an inconsistent decision of the United States Supreme Court requires modification of the decision") (quotations omitted). *Bruen* did not suggest that prohibitions on the possession of firearms by felons are unconstitutional. Indeed, *Bruen* did not address felon-in-possession laws or other status-based gun restrictions at all, a point emphasized in opinions joined by six justices. *See* 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm."); *id.* (explaining that *Bruen* did not "disturb[] anything that

[the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating *Heller*'s assurances that felons can be dispossessed of firearms); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on" *Heller*'s statements about felon-in-possession laws). Rather, *Bruen* "reiterate[d]" *Heller*'s "standard," explained that its holding was "[i]n keeping with *Heller*," and said it was "apply[ing]" the "test that [the Court] set forth in *Heller*." *Id.* at 2126, 2129, 2131. And *Bruen* endorsed pre-existing circuit precedents, like this Court's, that were "broadly consistent with *Heller*." *Id.* at 2127. This Court's pre-*Bruen* precedents thus remain sound.[4]

---

[4] The district court held that *Bruen* "requires some reconsideration of the *Heller* admonition," and that this Court's pre-existing precedents applying *Heller*'s "dicta" were inapplicable to Goins's as-applied challenge. Opinion, R.32, #177; *see also* Opinion, R.32, #175-178. For the reasons just explained, the government disagrees that *Bruen* is inconsistent with this Court's pre-existing precedents. Those cases thus remain binding, and the district court remained bound to apply them. S*ee ACLU of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) (concluding that "[l]ower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it") (quotations omitted); *see also Khami*, 362 F. App'x at 508 (applying *Heller* to reject as-applied Second Amendment challenge to Section 922(g)(1)). In any event, this Court is not bound by the district court's incorrect determination and "may affirm the district court's decision to deny [a] motion to dismiss for any reason supported by the record and the arguments of the parties." *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). This Court should thus affirm based on its binding pre-*Bruen* precedents.

Goins does not meaningfully grapple with this point. He instead suggests that, because *Bruen* "repudiated" means-end scrutiny, this Court's pre-existing precedents upholding Section 922(g)(1) are obsolete. *See* Br. 11 (citing *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012)). But, unlike *Greeno*, which "adopt[ed]" and employed means-end scrutiny to find that an application of U.S.S.G. § 2D1.1(b)(1) did not violate the Second Amendment, *Greeno*, 679 F.3d at 518, this Court's pre-*Bruen* (and pre-*Greeno*) precedent upholding Section 922(g)(1) relied on *Heller*'s repeated assurances that felon-disarmament laws were "longstanding" and lawful. *Frazier*, 314 F. App'x at 807 (quotations omitted); *Carey*, 602 F.3d at 741. Indeed, *Greeno* acknowledged that this Court's precedents upholding Section 922(g)(1) "relied on" *Heller*'s statements regarding felon-disarmament laws, rather than on means-end scrutiny, "to reject Second Amendment challenges to federal felon-in-possession of a firearm convictions." *Greeno*, 679 F.3d at 517. *Bruen*'s rejection of means-end scrutiny therefore did not abrogate this Court's pre-existing precedent upholding Section 922(g)(1).

Goins's contrary contention (like the district court's contrary conclusion) is inconsistent with the multiple district court decisions treating this Court's pre-existing precedent as binding and dispositive in *Bruen*-based Second Amendment challenges to Section 922(g)(1). *See, e.g.*, *United States v. Omar*, No. 22-cr-182, 2023 WL 7526045, at *4 (S.D. Ohio Nov. 14, 2023) (concluding that

"*Bruen* did not explicitly overrule *Heller*" and that the court was "bound by the assertions in *Heller* and *Carey* that the longstanding prohibitions on the possession of firearms by felons" are constitutional); *United States v. Ross*, No. 23-cr-20168, 2023 WL 7345908, at *11 (E.D. Mich. Nov. 7, 2023) (explaining that this Court's "pre-*Bruen* opinions remain binding" precedent); *United States v. Brown*, No. 22-cr-704, 2023 WL 7323335, at *3 (N.D. Ohio Nov. 7, 2023) (characterizing this Court's pre-*Bruen* precedent upholding Section 922(g)(1) as "binding" and declining to "deviate" from it); *United States v. Deryke*, No. 23-cr-92, 2023 WL 7101902, at *4 (W.D. Mich. Oct. 27, 2023) (concluding that "*Bruen* did nothing to disturb the holdings in" pre-*Bruen* circuit decisions upholding Section 922(g)(1), "and there is nothing to suggest that they would be decided differently in [*Bruen*'s] wake"); *United States v. Blackwell-Esters*, No. 22-cr-20287, 2023 WL 7093806, at *4 (E.D. Mich. Oct. 26, 2023) (concluding that *Bruen* did not abrogate *Heller* and pre-existing Sixth Circuit precedent); *United States v. McNeil*, No. 23-cr-20229, 2023 WL 6627972, at *1 (E.D. Mich. Oct. 11, 2023) (treating this Court's "unambiguous[]" holding in *Carey* as binding); *United States v. Miller*, No. 22-cr-645, 2023 WL 6065116, at *3 (N.D. Ohio Sept. 18, 2023) (similar); *United States v. Nailor*, No. 23-cr-20076, 2023 WL 6049746, at *5 (E.D. Mich. Sept. 15, 2023) (similar); *United States v. Taylor*, No. 23-cr-289, 2023 WL 5957107, at *2 (N.D. Ohio Sept. 12, 2023) (similar); *United States v. Nelson*, --- F.

Supp. 3d ---, 2023 WL 4249367, at *5 (E.D. Mich. June 29, 2023) (similar);
*United States v. Parker*, No. 22-cr-82, 2023 WL 3690247, at *3 & n.3 (W.D. Ky.
May 26, 2023) (similar); *United States v. Carter*, No. 22-cr-20477, 2023 WL
3319913, at *2 (E.D. Mich. May 9, 2023) (similar); *United States v. Smith*, No.
22-cr-20351, 2023 WL 2215779, at *1 n.3 (E.D. Mich. Feb. 24, 2023) (similar);
*United States v. Gleaves*, --- F. Supp. 3d ---, 2023 WL 1791866, at *3-4 (M.D. Tenn.
Feb. 6, 2023) (similar). It is also inconsistent with this Court's own recent
recognition that *Carey*, which "unambiguously held . . . that felon-in-possession
statutes do not violate the Second Amendment," "remains the binding law in
this circuit." *United States v. Vaughn*, No. 23-5790, Order at 2 (6th Cir. Sept. 28,
2023).[5] Because "*Carey* remains the precedent in this circuit," *id.*, Goins's
Second Amendment challenge to Section 922(g)(1) is foreclosed. This Court
should affirm on that basis.

---

[5] Since *Bruen*, another court of appeals has held, on plenary review, that its pre-
existing precedent upholding Section 922(g)(1) under the Second Amendment
survived *Bruen*. *See Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023)
(holding that although "*Bruen* created a new test for determining the scope of
the Second Amendment," it did not "indisputably and pellucidly abrogate [the
court's prior] precedential opinion" upholding Section 922(g)(1)).

C.  Even if *Bruen* Abrogated this Court's Felon-Dispossession
    Precedents, Goins's Second Amendment Challenge Fails.

Even if *Bruen* abrogated this Court's pre-existing precedent upholding
Section 922(g)(1) under the Second Amendment, Goins cannot prevail. The
Second Amendment's text, as historically understood, allows Congress to ban
firearm possession by felons. And Section 922(g)(1) is consistent with the
nation's historical tradition of firearm regulation.

1.  The Second Amendment's text and historical context
    confirm that felons can be disarmed.

The Second Amendment provides: "A well regulated Militia, being
necessary to the security of a free State, the right of the people to keep and bear
Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Second
Amendment, like the First and Fourth Amendments, codified a *pre-existing*
right," neither "granted by the Constitution" nor "dependent upon that
instrument for its existence." *Heller*, 554 U.S. at 592 (quotations omitted); *see also
id.* at 599 (explaining that "the Second Amendment was not intended to lay
down a 'novel principl[e]' but rather codified a right 'inherited from our English
ancestors'" (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The right
to bear arms is thus "enshrined with the scope [it was] understood to have when
the people adopted [it]." *Id.* at 634-35. As a matter of both text and history, the
Second Amendment does not prevent legislatures from prohibiting firearm

possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses. This is so for two reasons: first, felons are not among "the people" covered by the Second Amendment, and second, "the right . . . to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

*a. Felons are not among "the people."* Legislatures historically have had wide latitude to exclude felons from the political community because of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"— including "the idiot, the lunatic, *and the felon*, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id*. at 29, as well as from other, closely related "political rights"— including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998) (explaining that these were all historically understood as "political rights" and that, in particular,

17

"arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

It remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not only the right to bear arms, but also "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019); *see* 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement); *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office). Section 922(g)(1), like other exercises of legislative power to strip felons of rights belonging to members of the political community, accords with Congress's longstanding, historically rooted authority to impose a firearms-related disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). Although "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," "*Heller* recognizes" a "historically grounded and sensible" "exception for some Americans," including felons. *Id.* (citing *Heller*, 554 U.S. at 626); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v.*

*Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

Goins contends (Br. 15) that, because the Second Amendment's text does not expressly except felons from "the people" covered by the Amendment, that term necessarily includes individuals with felony convictions. But the question is whether the text, as informed by "this Nation's historical tradition of firearm regulation," is understood to exclude felons. *See Bruen*, 142 S. Ct. at 2126; *see also id*. at 2127. That the Amendment's text does not facially exclude felons has no bearing on the scope of the term as historically understood. As explained above, the term "the people" carries with it the understanding that legislatures may exclude felons, like Goins, from the political community.

For similar reasons, Goins is incorrect in asserting (Br. 16) that his regulated conduct in isolation, divorced from his status as a felon, is the only relevant textual metric under *Bruen*'s threshold inquiry. Goins's understanding of the textual inquiry is too narrow. The relevant question is whether the Amendment's plain text, as informed by history, permits disarming felons. *See Bruen*, 142 S. Ct. at 2126-27. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting those who have

demonstrated disregard for the rule of law through the commission of multiple felony offenses from possessing firearms.

Contrary to Goins's contention (Br. 17-18), the term "the people" need not bear precisely the same meaning in the Second Amendment that it does in other constitutional provisions that use the term. While the phrase "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id*. at 581, but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. And many other constitutional provisions use the term "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the [p]eople" who are entitled to elect members of Congress, *see* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII, Cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

Finally, this Court's decision in *Tyler* does not establish that Goins is among "the people." *See* Br. 16-17. *Tyler* applied means-end scrutiny to hold that the plaintiff in that case had a viable as-applied challenge to 18 U.S.C. § 922(g)(4), which prohibits an individual who has been "adjudicated as a mental defective or . . . committed to a mental institution" from possessing firearms. *Tyler*, 837 F.3d at 699. But *Tyler*, which pre-dates *Bruen*, did not grapple with the scope of the term "the people" under the Second Amendment at all, let alone suggest that felons are among "the people" protected by the Second Amendment. Rather, *Tyler* endorsed and distinguished this Court's prior decisions upholding Section 922(g)(1) under *Heller* by recognizing that "[a] felony conviction, unlike an adjudication of incompetence or involuntary commitment, 'trigger[s] a number of disabilities, many of which impact fundamental constitutional rights.'" *Tyler*, 837 F.3d at 688 n.9. *Tyler* thus confirmed that felons may be stripped of rights tethered to membership in the political community by virtue of their felon status.

**b. Felons are not "law-abiding citizens" entitled to the Second Amendment's protections.** Separate from the Second Amendment's textual limitation of the right to bear arms to "the people," the right itself has historically been understood to extend only to law-abiding citizens. "The reason is that the Amendment's text . . . codified what the *Heller* Court called a 'pre-existing right'"

that "extended (and thus extends) to some categories of individuals, but not others." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044 (11th Cir. 2022). Thus, "even individuals who are indisputably part of 'the people' . . . might not partake of that pre-existing right and, therefore, may be prohibited from possessing firearms without offending the Second Amendment." *Id.* at 1045-46.

The Supreme Court's authoritative interpretation of the Second Amendment's text confirm that view. *Heller* explained that the Amendment codified a "right of law-abiding, responsible citizens." 554 U.S. at 635. The Supreme Court identified a non-exhaustive list of "presumptively lawful regulatory measures," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (opinion of Alito, J.). *Bruen* confirmed this reading of *Heller*. Echoing *Heller*, the Court explicitly and repeatedly described the Second Amendment right as belonging only to law-abiding citizens. *See, e.g.*, *Bruen*, 142 S. Ct. at 2122 (stating that *Heller* "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense"); *id.* at 2131 (quoting *Heller*'s statement that the Second Amendment protects "'the right of law-abiding, responsible citizens to use arms' for self-defense"); *id.* at 2133 (stating that the historical inquiry should consider "how and why the regulations burden a law-

abiding citizen's right to armed self-defense"); *id.* at 2156 (holding that New York's licensing law violates the Second Amendment because "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"); *see also United States v. Alaniz*, 69 F.4th 1124, 1127 (9th Cir. 2023) (reading *Heller* as "conclud[ing] that [the Second Amendment] protects the 'law-abiding, responsible' citizen's possession of arms for the 'lawful purpose of self-defense'"). These repeated references indicate that laws restricting the gun rights of non-law-abiding citizens like convicted felons are consistent with the Second Amendment.

Two other aspects of *Bruen* confirm that a person's status as non-law-abiding resolves whether the Second Amendment extends to them. First, *Bruen* itself explained that the petitioners in that case were law-abiding when addressing the Second Amendment's textual scope, not when addressing historical precursors supporting the challenged law. *See* 142 S. Ct. at 2134. The Court observed that the parties did not dispute "that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* (citing *Heller*, 554 U.S. at 580). The Court thus implied that the Second Amendment covered them *because* they were undisputedly law-abiding, responsible citizens.

Second, *Bruen* explained that its opinion should not "be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," which "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right." 142 S. Ct. at 2138 n.9 (citing *Heller*, 554 U.S. at 635); *see also id.* at 2162 (Kavanaugh, J. concurring) ("[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). Those regimes require background checks and set "narrow, objective, and definite standards" meant to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotations omitted). And many (if not all) states' standards disqualify felons or anyone prohibited by federal law from having a gun.[6] By indicating that those regimes remain broadly constitutional, the Court strongly

---

[6] *See, e.g.*, Ky. Rev. Stat. § 237.110(4)(a) (applicant shall not be "prohibited from the purchase, receipt, or possession of firearms, ammunition, or both pursuant to 18 U.S.C. 922(g), 18 U.S.C. 922(n), or applicable federal or state law"); Ohio Rev. Code Ann. § 2923.125(d), (e) (applicant must not be "under indictment for or otherwise charged with a felony" and not have "been convicted of or pleaded guilty to a felony"); *see also* La. Rev. Stat. § 40:1379.3(C)(10) (applicant shall "[n]ot have been convicted of, have entered a plea of guilty or nolo contendere to, or . . . be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"); Miss. Code. Ann. § 45-9-101(d) (applicant shall be "ineligible to possess a firearm by virtue of having been convicted of a felony in a court of this state, of any other state, or of the United States"); Tex. Gov't Code § 411.172(a)(3) (applicant shall not have "been convicted of a felony").

implied that the Second Amendment's text excludes people, like felons, who are not law-abiding. Otherwise, the objective criteria of most shall-issue states disqualifying applicants for licenses—and thus preventing them from bearing arms—would be presumptively unlawful and could survive only through case-by-case, historical inquiries. The Court suggested no such thing.

Goins contends (Br. 19) that the term "law-abiding, responsible citizens" is too vague and expansive to define a meaningful class of people. But as explained, history and tradition show that the term "law-abiding" includes those who have committed serious crimes. Felons are undoubtedly among them. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983); *see Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017).

2.    <u>Our nation's historical tradition justifies disarming felons.</u>

Even assuming the Second Amendment's text covers felons, our nation's historical tradition supports disarming them. *Bruen*, 142 S. Ct. at 2126. History is replete with "representative historical analogue[s]" that justify Section 922(g)(1) under the Second Amendment. *Id*. at 2133-34 (emphasis omitted).

*a. Felony Punishment Laws.* Felonies have long been considered "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment

may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted); *see also Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (explaining that, at common law, "virtually all felonies were punishable by death").

Capital punishment and estate forfeiture were also commonly authorized punishments in the American colonies and then the states. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, piracy on the high seas, and forging or counterfeiting a public security. *See An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

These punishments often applied not only to violent crimes but also to crimes such as counterfeiting and forgery.[7]

*b. Disarmament of other criminal offenders and loyalists.* The commission of a crime that was not serious enough to justify the death penalty could still result in the loss of the right to possess arms. In 1624, for example, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). In 1775, Connecticut enacted a statute providing that a person who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, 15 *The Public Records*

---

[7] *See, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785-1788) at 664-66 (1886) (1788 law establishing death penalty and estate forfeiture for crimes such as robbery and counterfeiting); 9 William Waller Hening*, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature* 302-03 (1821) (1777 law punishing forgery with estate forfeiture, whipping, and up to seven years' service on an armed vessel); *Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America* 33-34 (1767) (1743 law punishing forging or counterfeiting bills of credit with death and estate forfeiture); 1 *The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments* 79 (1811) (1715 law punishing with estate forfeiture anyone convicted of corruptly "altering any will or record" in a way that resulted in injury to another's estate or inheritance).

*of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890). And during the American Revolution, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[8] These disarmament measures reflect broad legislative authority to decide when breaking the law warranted excluding even nonviolent offenders from the right to keep and bear arms.

*c. Historical Laws Disarming Those Deemed Dangerous.* Historical laws also demonstrate "that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272 (2020)

---

[8] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

(observing that in "each [relevant] historical period," "violent or otherwise dangerous persons could be disarmed").

"[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Greenlee, 20 Wyo. L. Rev. at 261; *see id.* at 259-61 (detailing history). In England, the 1662 Militia Act empowered the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. Parliament subsequently recognized a legal right to possess arms in the Bill of Rights. 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Ibid.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Ibid.*

While condemning the disarming of "good subjects," the English Bill of Rights allowed the disarming of irresponsible or dangerous ones. It did not displace the 1662 Militia Act, the use of which "continued unabated" after the adoption of the English Bill of Rights. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear*

*Arms*, 95 Notre Dame L. Rev. 397, 405 (2019).[9] Indeed, many 18th-century justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[10]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S. Ct. at 2139-42. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, and that it made violations punishable by forfeiture of the weapons.[11] And, even at the time of the American Revolution, the English Bill of Rights was understood

---

[9] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700–8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

[10] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[11] *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787); 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

to allow disarming irresponsible and non-peaceable subjects. In 1780, after London officials responded to widespread rioting by confiscating rioters' arms, the House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-132 (1994).

The American colonies inherited that English tradition. *See Heller*, 554 U.S. at 593 (the English right "has long been understood to be the predecessor to our Second Amendment"). Early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 30 U.S. (5 Pet.) 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.[12] Some 17th- and 18th-century American statutes expressly recodified that rule.[13] Others made

---

[12] *See, e.g.*, James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

[13] *See, e.g.*, Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch.

forfeiture part of the penalty for offenses such as unsafe storage of guns or gunpowder.[14] Although those laws concerned forfeiture of arms involved in an offense, rather than bans on possessing arms, they show that legislatures could restrict an individual's ability to bear arms if his conduct suggested that his possession of firearms would endanger others.

Precursors to the Second Amendment proposed at the state ratifying conventions also indicate that legislatures have long been permitted to disarm lawbreakers and those who are dangerous. A proposed bill of rights presented at the Pennsylvania ratifying convention stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention,

---

21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[14] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland, 1638-1674*, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210 (1906).

*id.* at 624, which was widely read and proved "highly influential" on the Bill of Rights. *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). The convention rejected the proposal, but only because Adams had waited until the morning of the day of ratification to present it. Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001).

Post-ratification commentators and legislative enactments confirm this understanding of the Second Amendment. For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, if he demeans himself peaceably, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should

not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

In the 1840's, states began to adopt surety statutes that required certain potentially irresponsible individuals who carried firearms to post bond. *See Bruen*, 142 S. Ct. at 2148. The earliest such statute, enacted by Massachusetts, required a gun owner to post bond if his conduct created "reasonable cause to fear an injury, or breach of the peace," and if he lacked a special need for self-defense. Mass. Rev. Stat. ch. 134, § 16 (1836). At least nine other jurisdictions adopted variants of that law later in the 19th century. *See Bruen*, 142 S. Ct. at 2148 & n.23 (collecting statutes). These firearm-specific surety laws were not a 19th-century innovation but built upon a surety tradition that existed at common law, *see* 4 William Blackstone, *Commentaries on the Laws of England* 252 (1769), was codified by some colonies in the 1700s,[15] and was commonplace in the period immediately after the founding.[16]

---

[15] *See Act About Binding to the Peace*, ch, 26, 1700 Pa. Laws 5; *Act About Binding to the Peace*, ch. 4, 1700 Del. Laws 52; 1702 Conn. Acts 91; *Act Declaring the Mode of Proceeding in Certain Criminal Cases*, ch. 30, § 16, 1789 Va. Laws 17-18.

[16] *See State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811); *Respublica v. Donagan*, 2 Yeates 437 (Pa. 1799); Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery* 65-66 (New Haven, Oliver Steele 1816).

As the 19th century wore on, guns became more lethal and more widely available. Guns in the 18th century generally fired only one shot, misfired, took a long time to load, and could not be kept loaded for long periods. Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). But technological developments in the 1800's—such as metallic cartridges; cheap, mass-produced revolvers; and guns capable of firing multiple shots—led to increased firearm use in homicides. *Id.* at 123-127. During this time, legislatures disarmed a range of individuals whom they deemed categorically unfit to carry firearms, including those below certain ages,[17]

---

[17] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67;

those of unsound mind,[18] vagrants,[19] and intoxicated persons.[20]

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never

---

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[18] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[19] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[20] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879).

intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

*Comparison with Section 922(g)(1)*. These historical sources are suitable precursors to Section 922(g)(1) because they are comparable in "how and why" they "burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. To be clear, Section 922(g)(1), which applies only to those who have committed felonies, does not burden "a *law-abiding citizen's* right" at all. *See Hamilton*, 848 F.3d at 626. Setting that aside, Section 922(g)(1) and these historical regulations "impose a comparable burden on the right of armed self-defense" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

Section 922(g)(1) and these historical laws impose a "comparable burden" because each prevents a person from possessing arms. Capital punishment and estate forfeiture laws did so indirectly, by either depriving felons of their lives or requiring them to forfeit all their possessions. Other laws, such as laws disarming loyalists or those deemed irresponsible and dangerous, targeted firearms directly. But all had the effect of disarming classes of individuals that the legislature determined should not possess or carry firearms.

Section 922(g)(1) and these historical laws are also "comparably justified." *Bruen*, 142 S. Ct. at 2133. Legislatures historically burdened firearm possession on the basis that certain people's lawbreaking, irresponsibility, lack of loyalty,

37

or other traits rendered them too untrustworthy to possess firearms. Similarly, Section 922(g)(1) targets those who have been "convicted of serious crimes" because, as a class, they can "be expected to misuse" firearms. *Dickerson*, 460 U.S. at 119; *see, e.g., Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

###### 3.   Goins's contrary arguments lack merit.

Goins disputes that these historical precursors justify Section 922(g)(1) on multiple grounds. Each of his arguments lacks merit.

a. Goins primarily contends (Br. 7, 10, 20-24, 26-28, 30-39) that the government was required to identify "distinctly similar"—as opposed to a "relevantly similar"—historical analogues to satisfy its burden of showing a historical tradition justifying Section 922(g)(1), and that each of the analogues on which it relies is insufficient.[21] But *Bruen* did not set out a two-tiered test of

---

[21] As part of this argument, Goins contends that historical laws disarming individuals based on race, religion, or condition of servitude are not sufficiently analogous to justify Section 922(g)(1). Br. 30-39. While the government relied on those analogues below to show a historical tradition for disarming felons, and the district court cited those historical sources to support its finding that Section

the sort Goins seeks. Rather, *Bruen* identified guideposts for "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. These guideposts are all part of a single test for deciding if a modern regulation is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id*. at 2133. The Supreme Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id*. at 2132. It further clarified that this historical inquiry is not "a regulatory straightjacket" and "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 2133.

Indeed, *Bruen* used "distinctly similar"—the key phrase on which Goins relies—just once. *Bruen*, 142 S. Ct. at 2131. And when it did, it described "the lack of a distinctly similar historical regulation" only as "relevant evidence," not as dispositive of the historical inquiry. *Id*. In conducting its historical survey of public carry laws, the Supreme Court never referenced the purported "distinctly similar" standard, even though the question of publicly carrying firearms would

---

922(g)(1) is constitutional as applied to Goins, *see* Opinion, R.32, #194-195, the government is not relying on those sources here.

surely qualify as a general societal problem that has persisted for centuries. On the other hand, the Court repeatedly asked whether early regulations were "relevantly similar" to New York's modern-day law. *See, e.g.*, *id.* at 2132-33, 2145, 2153. The district court thus did not err by concluding that the government needed only to identify "relevantly similar" analogues to satisfy its burden under *Bruen*.

b. Similarly, Goins argues (Br. 39-40) that because there are no Founding-era statutes specifically disarming felons, the government has failed to identify a longstanding historical tradition justifying Section 922(g)(1). Goins again misunderstands *Bruen*'s historical inquiry. *Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*" of the sort Goins would require. *Bruen*, 142 S. Ct. at 2133. The government's historical precursors are sufficiently like Section 922(g)(1) because they imposed severe consequences on the commission of a felony and authorized legislatures to disarm untrustworthy people. *See id*. at 2132. They are thus "analogous enough to pass constitutional muster." *Id*. at 2133.

Moreover, the lack of an identical historical statute does not suggest that the Founding generation would have regarded Section 922(g)(1) as incompatible with the Second Amendment. As one district court recently observed, a "list of the laws that happened to exist in the founding era is . . . not the same thing as

an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (emphasis omitted). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority, and the absence of a "dead ringer" cannot be held against the government. *Bruen*, 142 S. Ct. at 2133.

c. Goins contends (Br. 28-29) that because Founding-era precursors to the Second Amendment proposed in state ratifying conventions did not become law, they are not useful. Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-05. The Founding-era precursors reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

d. Finally, Goins argues (Br. 35) that passage by some states of laws "protecting privately owned firearms from distressed sales" preserved the "continued gun possession by irresponsible and/or law-breaking citizens." But

41

the history on which Goins relies does not reflect that there is a tradition of legislation specifically protecting criminal offenders from disarmament. They reflect only that legislatures did not *always* exercise their authority to seize arms in particular circumstances; ultimately, these examples underscore legislatures' power and discretion to determine when disarmament is warranted.

As explained above, Section 922(g)(1) is well-supported by historical precursors that justify disarming felons. Goins's arguments do not undermine this historical tradition.

### 4. Section 922(g)(1) is constitutional as applied to Goins.

In any event, as the district court properly found, Section 922(g)(1) is constitutional as applied to Goins, whose felony convictions for a fourth DUI offense and for possessing controlled substances show that he represents "a threat to public safety." Opinion, R.32, #197.

a. Goins's fourth DUI conviction "evinces a willingness to disregard the harm that his actions could inflict upon the public." Opinion, R.32, #198. Driving while intoxicated is itself an unquestionably dangerous crime. *See Begay v. United States*, 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2541 (2019) (Sotomayor, J., dissenting) "([D]runk driving poses significant dangers that [states] must be able

to curb."); *Virginia v. Harris*, 558 U.S. 978, 979-80 (2009) (Mem.) (Roberts, C.J., dissenting from denial of writ of certiorari) ("There is no question that drunk driving is a serious and potentially deadly crime . . . . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases."). In 2004, for example, 16,649 people died in alcohol-related motor vehicle crashes in the United States. *Traffic Safety Facts: 2004 Data*, Nat'l Highway Traffic Safety Ass'n, at 4, *available at* https://perma.cc/CM2L-WVT8. That amounts to an average of one death every 31 minutes. *Id.*

Driving under the influence also correlates to an increased risk of violence and death in the context of firearm possession. American legislatures have long recognized, and enacted laws to mitigate, the specific danger that arises when those who misuse or overcome alcohol are entrusted with firearms. *See, e.g.*, *supra* p.36 n.20. Common sense dictates that a person who repeatedly drives under the influence of drugs or alcohol cannot be trusted to safely handle another piece of potentially lethal machinery—namely, a firearm.

Empirical evidence confirms this conclusion. A systematic review and meta-analysis found that more than one-third of firearm homicide perpetrators and more than one-quarter of firearm suicide victims were acutely intoxicated at the time of the homicide or suicide. Charles C. Branas, *Alcohol Use & Firearm Violence*, 38 EPIDEMIOLOGIC REVS. 32, 36-37 (2016). Relatedly, DUI

offenders are significantly more likely than average to commit a violent crime in the future, even controlling for other criminal history. A longitudinal study of California handgun purchasers found that those with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within twelve years after the handgun purchase, compared to purchasers with no criminal record at all. Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 J. OF AM. MED. ASS'N: INTERNAL MED. 37, 38 (2019).

Goins's pattern of repeatedly driving while intoxicated supports the legislative determination that his possession of a firearm could be dangerous to public safety. Opinion, R.32, #197-198. Goins did not stop driving under the influence after his first DUI conviction in 2011; he was convicted of his second DUI offense in 2012, just one year later, and he went on to commit two additional DUI offenses (among other crimes) within two years of each other (one in 2017 and one in 2019). *See* PSR, R.72, #404, 406. Goins's criminal history, which evinces a repeated willingness to "disregard the harm that his actions" posed to others, supports the legislative judgment that he could represent "a threat to public safety" and should be disarmed. Opinion, R.32, #197-198.

b. Likewise, Goins's conviction for possession of controlled substances justified disarming him. "[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). Common sense establishes a clear link between drug use and dangerous firearm misuse. For example, drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). Illegal drug users may also use firearms to "commit crime in order to obtain money to buy drugs," *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment), or to commit "violent crime" that "may occur as part of the drug business or culture," *id*. And because of the *unlawful* nature of their activities, armed drug users are more likely to have dangerous confrontations with law enforcement officers. *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting) (observing that "drug dealing" is "dangerous because [it] often lead[s] to violence").

Statistics bear this out. Surveys indicate that as many as 17% of state prisoners and 18% of federal inmates claim to have committed their offenses to

obtain money for drugs. *Drug Use and Crime*, Bureau of Justice Statistics (June 1, 2021), *available at* https://bjs.ojp.gov/drugs-and-crime-facts/drug-use-and-crime. A study of drug court participants nationwide found that 16.4% of drug court graduates committed a subsequent felony level offense within a year of graduating. John Roman, Wendy Townsend, & Avinash Singh Bhati, *Recidivism Rates for Drug Court Graduates* 2 (2003), *available at* https://www.ojp.gov/pdffiles1/201229.pdf. That number increased to 27.5% two years from graduation. *Id.* Based on this data, the district court properly determined that Goins's drug offenses "indicate that he is more likely than the average person to commit a future felony," and that he is "the sort of threat to public safety that Congress can permissibly seek to eliminate by stripping him of his Second Amendment rights." Opinion, R.32, #199.

Contrary to Goins's contention (Br. 41-44), there is no real risk that the district court's determination that Congress may lawfully disarm those who "pose a danger to public safety" will permit legislatures to arbitrarily disarm disfavored groups. So long as *Bruen* remains the operative analytical framework, the government will have to demonstrate, using representative historical analogues, how and why any modern regulation is consistent with those analogues. *Bruen*, 142 S. Ct. at 2133. The government did that here. The district court thus did not err.

# CONCLUSION

For these reasons, this Court should affirm Goins's conviction.

Respectfully submitted,

CARLTON S. SHIER, IV
United States Attorney

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

CHARLES P. WISDOM, JR.
Appellate Chief

LISA H. MILLER
Deputy Assistant Attorney General

EMILY K. GREENFIELD
Assistant United States Attorney
Eastern District of Kentucky

/s/ Mahogane D. Reed
MAHOGANE D. REED
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Tel: (202) 615-1170
Mahogane.Reed@usdoj.gov

## DESIGNATION OF DISTRICT COURT DOCUMENTS

The government designates the following documents from the district court record:

| Dkt. No. | Document | Page ID # |
|----------|----------|-----------|
| R.1 | Indictment | 1-2 |
| R.15 | Motion to Dismiss | 38-39 |
| R.15-1 | Memorandum in Support of Motion to Dismiss | 40-49 |
| R.16 | Government Response to Motion to Dismiss | 55-61 |
| R.20 | Order for Supplemental Briefing | 83-87 |
| R.21 | Government Response to Order for Supplemental Briefing | 88-98 |
| R.22 | Superseding Indictment | 109-111 |
| R.32 | Opinion and Order Denying Motion to Dismiss | 173-199 |
| R.58 | Conditional Plea Agreement | 327-333 |
| R.68 | Judgment | 387-393 |
| R.69 | Notice of Appeal | 394 |
| R.72 | Presentence Investigation Report | 399-420 |

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,311 words, not including items excluded in accordance with Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 (a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Calisto MT.

/s/ Mahogane D. Reed
MAHOGANE D. REED

## CERTIFICATE OF SERVICE

I certify that, on November 21, 2023, an electronic copy of this brief was served by notice of electronic filing via this Court's ECF system.

/s/ Mahogane D. Reed

MAHOGANE D. REED

50