# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## No. 23-5848

---

### UNITED STATES OF AMERICA,

#### Plaintiff-Appellee

v.

### CHRISTOPHER GOINS,

#### Defendant-Appellant

---

### Appeal from the United States District Court
### For the Eastern District of Kentucky at Lexington
### Criminal Action No. 5:22-cr-91-S
### Hon. Gregory F. Van Tatenhove

---

### REPLY BRIEF FOR APPELLANT

---

**ROBERT L. ABELL**
**PO Box 983**
**Lexington, KY 40588**
**859-254-7076**
**859-281-6541 Fax**
**Robert@RobertAbellLaw.com**
**COUNSEL FOR APPELLANT**

# Table of Contents

**Page #**

Table of Contents.............................................................................ii

Table of Authorities.......................................................................iii

Introduction and Summary of Reply Argument.............................................1

Argument.......................................................................................3

1.    The Court's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) is not binding precedent.........................................3

2.    The Second Amendment protects an individual right distinguishable from "political" rights such as voting, jury service and holding public office, which require an individual to act as part of a collective..................................................................................6

3.    The Court should not attribute an inconsistent meaning to "the people" as used in the Constitution............................................9

4.    The Supreme Court did not rewrite the Second Amendment to protect only "law-abiding" individuals...............................................12

5.    *Bruen* requires the government to show a "distinctly similar" historical analogue to the application to Goins of 18 U.S.C. § 922(g)(1)....................................................................................15

6.    History does not support the proposition that felons lose their Second Amendment rights because of their status as felons.............18

7.    The Government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit..........23

Conclusion....................................................................................26

Certificate of Service......................................................................27

Rule 32(a)(7)(B) Certificate of Compliance...................................................27

## Table of Authorities

**Cases**                                                                        **Page #**

*Avery v. Everett*, 18 N.E. 148 (N.Y. 1888).....................................................20

*Binderup v. Attorney General,* 836 F.3d 336, 344 (3rd Cir. 2016)
     (en banc), *cert. denied*, 582 U.S. 943 (2017).......................................13

*Bowles v. Habermann*, 95 N.Y. 246 (1884)..................................................21

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264(1821).........................................5

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...........................*passim*

*In re Estate of Nerac*, 35 Cal. 392 (1868).......................................................20

*Kanter v. Barr,* 919 F.3d 437 (7th Cir. 2019).............................7-12, 14, 19-21

*Lange v. California*, 141 S.Ct. 2011 (2021).....................................................14

*Massachusetts v. United States*, 333 U.S. 611 (1948)....................................5

*McDonald v. City of Chicago*, 561 U.S. 242 (2010).......................................13

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019)........................................7

*New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022).......*passim*

*Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023)(*en banc*).........10-14,
                                                                                                19, 22-23

*Ruffin v. Commonwealth*, 62 Va. 790 (1871)................................................21

*Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678 (6th Cir. 2016)
     (*en banc*)..............................................................................................4

*United States v. Carey*, 602 F.3d 738 (6th Cir. 2010)..............................1, 3-6

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023)...................15-17, 23-26

*United States v. Goins*, 647 F.Supp.3d 538 (E.D. Ky. 2022)...............*passim*

*Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019).................................1, 3-6

## Constitutional Provisions & Statutes

U.S. Const. amend. II..............................................................................*passim*

18 U.S.C. § 922(g)(1)............................................................................*passim*

18 U.S.C. § 922(g)(3)...................................................................................17

## Other Authorities

John D. Bessler, *Cruel & Unusual* (2012).......................................................20

Thomas M. Cooley, *A Treatise on the Constitutional Limitations*
      (1st ed. 1868)...........................................................................................7

Saul Cornell, *"Don't Know Much About History" The Current Crisis
      in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002)......7

Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law
      & Hist. Rev. 161 (2004).........................................................................8

Lawrence M. Friedman, *Crime and Punishment in American History*
      (1993)......................................................................................................19

Robert H. Churchill, *Gun Regulation, the Police Power, and the
      Right to Keep Arms in Early America: The Legal Context
      of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007).................27

**Introduction and Summary of Reply Argument**

This reply brief offers the following argument points:

(1) This Court's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) is not binding precedent foreclosing Goins' challenge to his prosecution under 18 U.S.C. § 922(g)(1). The panel in *Carey* accepted and repeated a grossly erroneous concession by the appellant therein regarding the scope of the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Court clarified in *Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019), that binding precedent is not established "just because, in an earlier [case], a party conceded an issue and the panel took that concession at face value."

(2) The individual right to keep and bear arms protected by the Second Amendment is distinguishable from "political" or civic rights such as voting, jury service and holding public office, which require an individual to act as part of a collective. There is a historical tradition of stripping felons of such political or civic rights but not the individual Second Amendment right.

(3) The Court should not attribute inconsistent meanings to the term "the people" as used in the Constitution as the government suggests. The Supreme Court suggested in *Heller* that this would be inappropriate.

Moreover, doing so would intrude improperly on legislative prerogatives to fashion public policy.

(4) The Supreme Court has not held that the Second Amendment applies only to "law-abiding" individuals. The Court should not accept the government's invitation to over-read dicta from Supreme Court opinions.

(5) The Supreme Court established in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022) "two conceptual pathways" to evaluate the constitutionality of firearm regulations. Which pathway is applied depends on whether the regulation addresses a chronic problem dating back to the 18th century or an unprecedented or dramatically new problem or development. At issue here is the age-old problem of crime. Accordingly, the government has to identify a "distinctly similar" historical analogue to the application of 18 U.S.C. § 922(g)(1) to Goins.

(6) Contrary to the government's contentions, history does not support the proposition that felons lose their Second Amendment rights because of their status as felons.

(7) The government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit.

**Argument**

**1.    The Court's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) is not binding precedent**

Contrary to the government's contention in point (B) of its brief, this Court's decision in *United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) did not establish binding precedent foreclosing Goins's challenge to his prosecution under 18 U.S.C. § 922(g)(1). First, the panel in *Carey* accepted and repeated the appellant's grossly incorrect concession that the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), "specifically upheld firearm prohibitions for felons." 602 F.3d at 739. *Heller* did no such thing. Second, as the Court observed in *Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019), a binding precedent is not established "just because, in an earlier [case], a party conceded an issue and the panel took that concession at face value." *Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019).

The source of this dissonance is dicta in *Heller* found at 554 U.S. 626-27 & n. 26, and stating in full as follows:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or

> laws imposing conditions and qualifications on the commercial
> sale of arms.[26]

554 U.S. at 626-27.

*Carey* repeated this quote from the body of the *Heller* opinion, 602

F.3d at 741, but omitted footnote 26 of *Heller*, which provides as follows:

> We identify these presumptively lawful regulatory measures
> only as examples; our list does not purport to be exhaustive.

554 U.S. at 627 n. 26.

Later, in *Tyler v. Hillsdale Cty. Sheriff's Office*, 837 F.3d 678, 681 (6th

Cir. 2016), the *en banc* Court observed that the foregoing in *Heller* merely

noted "that longstanding prohibitions on the possession of firearms by

felons and the mentally ill are 'presumptively lawful.'" In sum, the *Carey*

panel accepted an erroneous concession on a point of law from the

appellant and then repeated it; the error is glaring since footnote 26 from

*Heller* is omitted.

The *Carey* panel's acceptance of the appellant's incorrect concession

regarding the scope of *Heller*'s holding does not establish a binding

precedent barring Goins's challenge. In *Wright v. Spaulding, supra*, the

Court carefully analyzed what constitutes a binding precedent established

by a prior panel decision, which triggers "the rule that the holding of a

4

published panel opinion binds all later panels unless overruled or abrogated en banc or by the Supreme Court." 939 F.3d at 700.

There are two key points in the *Wright* analysis applicable here. First, after reviewing cases where the Court had accepted parties' concessions on particular issues, it concluded that "[o]ur hands are not tied in a later case just because, in an earlier one, a party conceded an issue and the panel took that concession at face value." *Id.* at 704. Second, the Court further observed that "[i]t would be at least imprudent, and maybe improper, to make binding precedent out of a court's simple acquiescence in the parties' concessions and assumptions." *Id.*, *citing Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821); *Massachusetts v. United States*, 333 U.S. 611, 639-40 (1948)(Jackson, J., dissenting)("I see no reason why I should be consciously wrong today because I was unconsciously wrong yesterday."). Very well put.

The government is correct that the Court in a number of unpublished, non-precedential cases, some of which relied on the mistakes in *Carey*, rejected Second Amendment challenges. The government is also correct that a number of district courts have mistakenly relied on *Carey*, in full or part, to reject Second Amendment challenges to 18 U.S.C. § 922(g)(1) similar to that now presented by Goins. These cases, unfortunately,

illustrate the "snowballing consequences" when a court accepts a party's erroneous concession on a point of law. *Wright*, 939 F.3d at 701. *Carey* well illustrates the wisdom of the *Wright* rule that "[o]ur hands are not tied in a later case just because, in an earlier one, a party conceded an issue and the panel took that concession at face value." *Id*. at 704. Accordingly, the Court should reject the government's contention that Goins's challenge to § 922(g)(1) is barred by *Carey*.

## 2.   The Second Amendment protects an individual right distinguishable from "political" rights such as voting, jury service and holding public office, which require an individual to act as part of a collective

Contrary to the government's argument in point C.1.a. of its brief (pp. 17-21), Goins remains among "the people" covered by the Second Amendment, notwithstanding his felony convictions. The leading thrust of the government's argument is that felons may be barred from voting and other "political rights" such as jury service and holding public office, and, therefore, also from bearing arms. Govt. brief at 17-18. Although the government does not use the terms in its brief, this argument articulates what some have referred to as the "virtuous citizen" theory of the Second Amendment. The district court considered its merits and found them wanting. 647 F.Supp.3d at 545. The district court relied largely on now-

6

Justice Barrett's analysis in her dissent in *Kanter v. Barr*, 919 F.3d 437, 462-64 (7th Cir. 2019). That reliance was apt.

"While scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms, history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens." 919 F.3d at 462 (Barrett, J., dissenting), *citing* Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness")(cited in Govt. Brief at 17); Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). "On this view, the legislature can disarm felons because of their poor character, without regard to whether they are dangerous." Barrett dissent in *Kanter v. Barr*, 919 F.3d at 462 (Barrett dissent), *citing Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019)(*Medina* cited in Govt. brief at 18).

One major problem with the government's argument "is that virtue exclusions are associated with civic rights – individual rights that 'require[ ] citizens to act in a collective manner for distinctly public purposes.'" Barrett dissent, 919 F.3d at 462, *quoting* Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161, 165 (2004). Voting and jury service both require an individual to act "as part of [a] collective enterprise" of self-governance in the former and for the administration of justice in the latter. *Id.* at 462. Some scholars analogized the right to bear arms with these civic rights, when the right was mistakenly thought limited to participation in a well-regulated militia. *Id.*

The second problem with the government's argument is that "*Heller* ... expressly rejects the argument that the Second Amendment protects a purely civic right." *Id.* at 463. *Heller* "squarely held that 'the Second Amendment confer[s] an individual right to keep and bear arms,' and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself – not in his right to serve in a well-regulated militia." *Id.* The government here, as in *Kanter v. Barr*, has presented no evidence or authority that "virtue exclusions ever applied to individual, as opposed to civic, rights." *Id.* "And if virtue exclusions don't apply to individual rights, they don't apply to the Second Amendment." *Id.*

History, as the district court and Justice Barrett in her *Kanter v. Barr* dissent observed, also provides little support to the government. While ten states adopted constitutions that excluded or permitted the exclusion of felons from voting, and some early state legislatures barred felons from jury service, the state analogs of the Second Amendment do not explicitly limit the right to bear arms to virtuous citizens. 647 F.Supp.3d at 546; Barrett dissent, 919 F.3d at 463-64. By 1820, nine states had enshrined the right to bear arms in their constitutions. *Id.* None of them made an exception for criminals. *Id.* Seven of these nine states included explicit limitations on criminals' right to vote in their constitutions. *Id.* Had early legislatures understood a virtue limitation to apply to the right to bear arms, they would have explicitly included it as they did with the voting franchise. *Id.* "Thus, although the right protected by the Second Amendment is not unlimited, its limits are not defined by a general felon ban tied to a lack of virtue or good character." Barrett dissent, 919 F.3d at 464.

## 3.   The Court should not attribute an inconsistent meaning to "the people" as used in the Constitution

The government urges that "the term 'the people' need not bear precisely the same meaning in the Second Amendment that it does in other constitutional provisions that use the term." Govt. brief at 20. It offers that felons are "not among 'the people' who adopted the Constitution, or 'the

[p]eople who are entitled to elect members of Congress, or 'the people' who reserved powers not delegated to the government." *Id.* (citations omitted). And, therefore, the government urges, neither is Goins, a felon, among the people covered by the Second Amendment. Similar arguments were considered and rejected by the *en banc* Third Circuit in *Range v. Attorney General*, 69 F.4th 96 (2023), and by the district court here; both relied heavily on Justice Barrett's dissent in *Kanter v. Barr, supra*.

The Third Circuit noted, as the government also cites in its brief, Govt. brief at 20, that the Constitution references "the people" "twice with respect to voting for Congress," and recognizes them "as having rights to assemble peaceably, to petition the government for redress, and to be protected against unreasonable searches and seizures." 69 F.4th at 101-02. However, "[u]nless the meaning of the phrase "the people" varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among 'the people' for Second Amendment purposes would exclude him from those rights as well." *Id.* at 102, *citing Heller*, 554 U.S. at 580. "And we see no reason to adopt an inconsistent reading of 'the people.'" 69 F.4th at 102. Neither should this Court.

10

The Third Circuit acknowledged that an individual with Second Amendment rights may be denied possession of a firearm and agreed with Justice Barrett's reasoning in *Kanter v. Barr* that the better analytical approach was to consider when a legislature may constitutionally strip an individual of their rights. *Id.* The district court here, in advance of the *en banc* Third Circuit in *Range*, similarly relied on Justice Barrett's dissent in *Kanter v. Barr*. 647 F.Supp.3d at 545-46. We turn again to that discussion.

Justice Barrett acknowledged in *Kanter v. Barr* that "[t]here are competing ways of approaching the constitutionality of gun dispossession laws," "one uses history and tradition to identify the scope of the right, and the other uses that same body to evidence to identify the scope of the legislature's power to take it away." 919 F.3d at 452. The district court made the same observation. 647 F.Supp.3d at 546-47. It is more than a matter of semantics.

The district court discussed the odd results that the approach urged by the government – defining Goins completely out of the Second Amendment – could yield. "If some people fall entirely outside of the Second Amendment's scope, then no state action would be required to disarm them." *Id.* at 547, *citing* Barrett dissent in *Kanter*, 919 F.3d at 452. Suppose, the district court continued, "a law under which Congress chooses

to disarm DUI convicts for ten years." 647 F.Supp.3d at 547. If Goins is not among "the people" covered by the Second Amendment, he could find himself twenty years after his DUI conviction beyond the period for which Congress sought to disarm him yet he would still lack Second Amendment rights." *Id. citing* Barrett dissent, 919 F.3d at 452. The government's approach would erode Congress's capacity to make public policy consistent with the Constitution.

The approach urged by the government is inconsistent with other contexts involving the loss of a right, when "state action determines the scope of the loss (subject, of course, to any applicable constraints)." Barrett dissent, 919 F.3d at 452-53. A good example is voting rights: felons can have their voting rights removed, if their state chooses to do so; but if the state does not do so, their voting rights remain constitutionally protected. *Id*. at 453. A parallel approach makes sense for the right to keep and bear arms: "a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes eligible to lose it." *Id*.

The Court, consistent with the analyses of the *en banc* Third Circuit in *Range*, Justice Barrett's dissent in *Kanter v. Barr*, and the district court, should reject the government's argument.

**4. The Supreme Court did not rewrite the Second Amendment to protect only "law-abiding" individuals**

The government also attempts to preempt Goins's challenge to §

922(g)(1) by arguing that the Supreme Court, by way of dicta in *Heller* and

*Bruen*, has limited the Second Amendment only to those deemed "law-

abiding." Govt. brief at 21-25. A similar argument was rejected by the *en*

*banc* Third Circuit in *Range* and by the district court here.

The Third Circuit recited four grounds to reject this rewrite of the

Second Amendment proposed by the government. First, the criminal

histories of the plaintiffs in *Heller*, *Bruen*, and also in *McDonald v. City of*

*Chicago*, 561 U.S. 742 (2010), the third of the Supreme Court's major

Second Amendment cases in the last two decades, were not at issue, so the

references to "law-abiding, responsible" citizens was mere dicta. 69 F.4th at

101. Second, the Third Circuit was not inclined to overread these dicta

because doing so would require "the people" covered by the Second

Amendment to be inconsistent with "the people" referred to elsewhere in

the Constitution. *Id.* at 102.

Third, the proper analytical approach is to determine whether an

individual's Second Amendment rights may be constitutionally stripped,

not to conclude preemptively that they have been forfeited. For this, the

Third Circuit cited and quoted one of its earlier *en banc* Second

Amendment cases, *Binderup v. Attorney General,* "[t]hat individuals with

Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical." 69 F.4ᵗʰ at 102, *quoting* 836 F.3d 336, 344 (3ʳᵈ Cir. 2016)(Ambro, J.), *cert. denied*, 582 U.S. 943 (2017). It also agreed with Justice Barrett's "dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that 'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id., quoting* 919 F.3d at 452.

Finally, "the phrase 'law-abiding, responsible citizens' is as expansive as it is vague." 69 F.4ᵗʰ at 102. The Third Circuit pondered if it could exclude recipients of traffic tickets from the Second Amendment, whether it distinguished between felons and misdemeanants, noting the Supreme Court's recent observation that "'a felon is not always more dangerous than a misdemeanant.'" *Id.*, *quoting*, *Lange v. California*, 141 S. Ct. 2011, 2020 (2021). Furthermore, such an approach would grant extreme deference to the legislature to define the scope of the Second Amendment, which would countermand "*Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" 69 F.4ᵗʰ at 102, *quoting* 554 U.S. at 636 and also *citing*, *Bruen*, 142 S.Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

The district court similarly rejected the government's over-reading of *Bruen*'s references to "law-abiding" individuals. It noted that the "issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court" in *Bruen* and so it held no more than "it is sufficient to be law-abiding to qualify for Second Amendment protection." 647 F.Supp.3d at 545.

The Court should, as did the *en banc* Third Circuit and the district court here, reject the government's contention that Supreme Court dicta has removed Goins from the Second Amendment.

**5. *Bruen* requires the government to show a "distinctly similar" historical analogue to the application to Goins of 18 U.S.C. § 922(g)(1)**

The government's contention, Govt. brief at 38-40, that it is required only to identify a "relevantly similar" historical analogue instead of a "distinctly similar" one is incorrect. This argument is contrary to a straight-forward reading of *Bruen*. Furthermore, the Fifth Circuit in *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023), observed that *Bruen* provided "two conceptual pathways" depending on whether the regulation addressed a chronic problem dating back to the 18th century or an unprecedented or dramatically new problem or development.

The relevant language in *Bruen* articulating the first of these "two conceptual pathways" is as follows:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, *the lack of a distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.

142 S.Ct. at 2131 (emphasis added).

Neither time nor technology nor social problems stand still or remain static, of course, and so the Court in *Bruen* recognized that a second and looser analytical approach should be applied where "unprecedented societal concerns" or "dramatic technological changes" that were unforeseeable to the Founders were at issue:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. ... Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two

regulations are "relevantly similar."

142 S. Ct. at 2132.

The "two conceptual pathways" indicated by Bruen are as follows: (1) if the regulation aims at a problem extant in and persisting since the 18th century, the government must identify "distinctly similar" historical analogues to support the challenged law's constitutionality; and, (2) if the regulation has been occasioned by "unprecedented societal concerns or dramatic technological changes" the government need only show a "relevantly similar" historical analogue. This is the Fifth Circuit's conclusion in *Daniels* and its analysis is helpful

In *Daniels*, the Fifth Circuit considered the constitutionality of 18 U.S.C. § 922(g)(3), which bars an individual from possession a firearm if he is an "unlawful user" of a controlled substance. *Bruen* required two steps, the court explained, the first being whether the Second Amendment's plain text applied to the individual conduct, and the second "requir[ing] both close attention to history and analogical reasoning." 77 F.4th at 341. As to how a historical tradition of comparable gun regulation could be identified, "*Bruen* helpfully [provides] two pathways." *Id*. at 342. The Fifth Circuit explained these two pathways as follows:

> If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a

distinctly similar historical regulation addressing that problem
is relevant evidence that the challenged regulation is
inconsistent with the Second Amendment." *Id.* at 2131. But if a
modern law addresses "unprecedented societal concerns or
dramatic technological changes," it calls for a "more nuanced
approach." *Id.* at 2132. We must reason by analogy to determine
whether older regulations are "relevantly similar" to the modern
law. *Id.*

77 F.4th at 342.

Goins is not offering a unique or innovative reading of *Bruen*, which,

as the Fifth Circuit concludes correctly, offers "two conceptual pathways" to

consider a challenged regulation, the choice depending on whether it aims

at an old or new problem or issue. The government's contention to the

contrary is without merit. Furthermore, the government does not contend

that this case involves or presents either "unprecedented societal concerns

or dramatic technological changes." Accordingly, to sustain its burden, the

government is required to identify "distinctly similar" historical analogues

to § 922(g)(1)'s application to Goins. As seen herein and in Goins's main

brief, the government has failed.

### 6.    History does not support the proposition that felons lose their Second Amendment rights because of their status as felons

Contrary to the government's contentions Goins felon status forfeits

his Second Amendment rights, Govt. brief points C.2.a – b, "[h]istory does

not support the proposition that felons lose their Second Amendment rights

18

solely because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019)(Barrett, J., dissenting). The government urges that felons in the Founding era were subject to the death penalty and/or estate forfeiture, and, therefore, being subject to these penalties greater than disarmament, there is a historical tradition that supports Goins's disarmament and prosecution. The district court rejected these arguments and relied on the dismantling of them by Justice Barrett in her *Kanter v. Barr* dissent. 647 F.Supp.3d at 550-51. The *en banc* Third Circuit also rejected them in *Range v. Attorney General, supra.*

"The premise of [the government's] argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky." Barrett dissent, 919 F.3d at 458. "While it accurately describes the punishment of felons at English common law, the American picture is far more complex." *Id.* "During the period leading up to the founding, the connection between felonies and capital punishment started to fray." *Id.* at 459. "Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'" *Id., quoting* Lawrence M. Friedman, *Crime and Punishment in American History* 42

19

(1993). "By the time the Constitution was ratified, James Wilson observed that while the term 'felony' was once 'very strongly connected with capital punishment,' that was no longer true." 919 F.3d at 459, *quoting* John D. Bessler, *Cruel & Unusual* 52–53 (2012)(further citation and quote omitted). While many crimes remained eligible for the death penalty, that varied from state to state; in sum, death no longer inevitably followed a felony conviction. 919 F.3d at 459.

History shows that the shift in punishment for felonies was matched by a shift in the meaning of civil death, which had been previously connected to a capital sentence. *Id.* "As courts hammered out the incongruities between civil death and continued life over the next century, they settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights." *Id.* at 461, *citing Avery v. Everett*, 18 N.E. 148, 154-55 (N.Y. 1888)(suggesting that a life convict maintained a right to defend an action brought against him and certain property rights, including the ability to transfer property by will or deed). As to those felons serving less than a life sentence, the cases began to hold "that the rights of felons serving less than life were merely *suspended* during the term of the sentence." 919 F.3d at 461, *citing In re Estate of Nerac*, 35 Cal. 392, 396 (1868) ("If the convict be

sentenced for life, he becomes *civiliter mortuus*, or dead in law.... If, however, he be sentenced for a term less than life, his civil rights are only suspended during the term."); *Ruffin v. Commonwealth*, 62 Va. 790, 796 (1871) (explaining that a convict is "*civiliter mortuus,*" but only "[f]or the time being, during his term of service in the penitentiary"); *Bowles v. Habermann*, 95 N.Y. 246, 247 (1884) (applying a statute, which provided that "a sentence of imprisonment in a State prison for any term less than for life ... suspends, during the term of the sentence, all the civil rights ... of, or held by, the person sentenced.").

The lesson of this history is that the consequences of a felony conviction were not as categorically severe as the government urges. Barrett dissent, 919 F.3d at 461 . Capital punishment was "less pervasive than" the government urges and "civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights." *Id*. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed." *Id.* While felons in the Founding era were stripped of some rights, "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a

21

convicted felon or to the uniform severity of punishment that befell the class." *Id.* at 461.

The Third Circuit rejected the government's attempts to analogize Founding era statutes imposing the death penalty to the situation of the plaintiff before it. "That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105. "The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed." *Id.* Furthermore, in the Founding era, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society, as both the majority and a dissent in *Range* noted. *Id.*; 69 F.4th at 127-28 (Krause, J., dissenting).

The government's argument that history tells us that Goins's status as a felon forfeited his Second Amendment rights is without merit. The Court should reject it.

7. **The Government's contention that the Second Amendment grants Congress "broad legislative authority" to decide to disarm those deemed "dangerous" is contrary to *Bruen* and without merit**

The government contends that some disarmament measures "reflect broad legislative authority," Govt. brief at 28, and urges further that a variety of laws and failed resolutions at state constitutional ratification conventions show that broad authority could be exercised to disarm those deemed dangerous. Govt. brief at 28-37. The district court also relied on a general concept of dangerousness. The Fifth Circuit considered and rejected a similar sweeping argument in *Daniels, supra*.

The Fifth Circuit in *Daniels* assumed that "the Second Amendment encodes some government power to disarm the dangerous[.]" 77 F.4th at 353. It saw two problems with what it characterized as the government's "dangerousness principle." *Id.* First, granting the legislature broad authority to designate a group of persons as "dangerous" and disarm them would permit Congress to "claim that immigrants, the indigent, or the politically unpopular were presumptively 'dangerous' and eliminate their Second Amendment rights without judicial review." *Id.* The *en banc* Third Circuit made a similar observation in *Range v. Attorney General* and further noted that such "deference would contravene Heller's reasoning

23

that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" 69 F.4th at 103, *quoting* from 554 U.S. at 636.

Second, *Bruen* forbids courts from "balancing a law's justifications against the burden it places on rightsholders." 77 F.4th at 353, *citing* 142 S.Ct. at 2127. The example the Fifth Circuit discussed was "a state legislature [that] disarms all men, citing statistics that men commit more violent crimes than do women." 77 F.4th at 353 n. 39, *citing* FBI statistics that in 2012, "approximately 80% of offenders arrested for violent crimes were men." This example is materially indistinguishable from the statistical evidence that the government discusses in its brief at pages 43-46 to justify Goins's disarmament and his prosecution under § 922(g)(1). "But *Bruen* forswears that kind of review." 77 F.4th at 353, *citing* 142 S.Ct. at 2129.

The solution, one recognized by the Fifth Circuit in *Daniels* and one, in all fairness, partially recognized by the government, "is to analogize to particular regulatory traditions instead of a general notion of 'dangerousness.'" *Id.* at 354.[1] The key questions, the Fifth Circuit

---

[1] The government puts it slightly differently: "So long as *Bruen* remains the operative analytical framework, the government will have to demonstrate using representative historical analogues, how and why any modern regulation is consistent with those analogues." Govt. brief at 46, *citing Bruen*, 142 S.Ct. at 2133.

24

elaborated, consistent with Bruen's "why" and "how" analysis are as
follows:

> *Why* was the group considered dangerous at the Founding and
> therefore disarmed? And *why* does the modern law classify a
> person as presumptively dangerous? Is the comparison
> supported by the record? Furthermore, *how* did the historical
> regulation limit the rights of the dangerous class? And *how*
> does the modern regulation do so?

77 F.4th at 354.

The government's theory of danger-based disarmament falls apart
when this framework is applied. As in *Daniels*, "[t]he government identifies
no class of persons at the Founding (or even at Reconstruction) who were
'dangerous' for reasons comparable to" drunkards or drug users. *Id.* at 354.
Neither alcoholics nor drug users are "a class of political traitors, as British
Loyalists were perceived to be." *Id.* "Nor are they like Catholics and other
religious dissenters who were seen as potential insurrectionists." *Id.* And
even if the Court were to consider the detestable racially discriminatory
laws extant at the Founding and later, Goins "is not like the minorities who
the Founders [and many state governments] thought threatened violent
revolt." *Id.*

The government does no better by its reliance on the English Militia
Act of 1662 or the drafts of the Second Amendment that were considered by
various state conventions but did not make it into text. Those notions, "at

25

the time of the Founding, … referred specifically to violence or rebellion, not generalized public harm." *Daniels*, 77 F.4th at 354. And § 922(g)(1) "is not limited to those with a history of violent behavior – not all" alcoholics or drug users are violent and the "government has not shown how [Goins's alcohol abuse or drug use] predisposes him to armed conflict or that he has a history of" violence because of either. *Id*. "[N]either Congress nor the states disarmed alcoholics, the group most closely analogous to [drug] users in the 18th and 19th centuries." *Id*. at 354-55. "Which are [drug users or alcoholics] more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter." *Id*. at 355.

The Court is required by *Bruen* to determine whether the historical record contains "distinctly similar" laws that disarmed felons on account of that status or that disarmed proven drunkards or drug users. There is no such record.

The question presented here is narrow. Goins wasn't found in possession of a firearm while he was intoxicated either by alcohol or by drugs. The Court need not determine whether those factors make a difference; that case will come. The issue here is whether the Second Amendment allows Goins to possess while in his home and sober a firearm for self-defense. The government is required to identify a "distinctly

similar" historical analogue showing he may not; it has failed. Indeed, the government has failed to contravene the assertion that American law has historically observed a "zone of immunity" for "the people" surrounding their private ownership and possession of firearms in the home. Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 142 (2007).

## Conclusion

For all the foregoing reasons, the judgment of the district court should be vacated and reversed and the indictment ordered dismissed.

Respectfully Submitted,

By: /s/ Robert L. Abell
ROBERT L. ABELL
120 North Upper Street
Lexington, KY 40507
COUNSEL FOR APPELLLANT
CHRISTOPHER GOINS

**Certificate of Service**

I hereby certify that the foregoing was electronically filed with the Sixth Circuit's electronic filing system this 28th day of November 2023, that notice will be sent electronically by that system to All Counsel of Record.

/s/ Robert L. Abell
COUNSEL FOR APPELLANT

**Certification of Compliance
Pursuant to FRAP 32(a)(7)(B)**

This reply brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 5,912 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

/s/ Robert L. Abell
COUNSEL FOR APPELLANT